1   KEKER & VAN NEST, LLP
    ROBERT A. VAN NEST - #84065
2   MICHAEL H. PAGE - #154913
    R. JAMES SLAUGHTER - #192813
3   710 Sansome Street
    San Francisco, CA  94111-1704
4   Telephone:  (415) 391-5400
    Facsimile:  (415) 397-7188
5
    Attorneys for Defendants
6   FIRST DATA CORP., CARDSERVICE
    INTERNATIONAL, INC., and HUMBOLDT BANK
7
8   [ADDITIONAL COUNSEL ON FOLLOWING PAGE]
9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                         SAN JOSE DIVISION
12
13
    PERFECT 10, INC., a California corporation,   | Case No. C 04 0371 JW (PVT)
14
                                 Plaintiff,       | **ALL DEFENDANTS' CONSOLIDATED
15                                                | MEMORANDUM OF POINTS AND
              v.                                  | AUTHORITIES IN SUPPORT OF
16                                                | MOTION TO DISMISS**
    VISA INTERNATIONAL SERVICE
17  ASSOCIATION; FIRST DATA CORP., a              | Date:     June 14, 2004
    corporation; CARDSERVICE                      | Time:     9:00 a.m.
18  INTERNATIONAL, INC., a corporation;           | Dept:     Courtroom 8, 4th Floor
    MASTERCARD INTERNATIONAL                      | Judge:    Honorable James Ware
19  INCORPORATED, a corporation;
    HUMBOLDT BANK, a national banking
20  association; and DOES 1 through 100,
    inclusive,
21
                                 Defendants.
22
23
24
25
26
27
28

1   TOWNSEND AND TOWNSEND AND CREW LLP
    DANIEL J. FURNISS - #73531
2   MARK T. JANSEN - #114896
    JOHN C. BAUM - #167570
3   Two Embarcadero Center, Eighth Floor
    San Francisco, CA  94111
4   Telephone:  (415) 576-0200
    Facsimile:  (415) 576-0300
5
    Attorneys for Defendant
6   VISA INTERNATIONAL SERVICE ASSOCIATION

7
    WINSTON & STRAWN LLP
8   ANDREW P. BRIDGES - #122761
    101 California Street, Suite 3900
9   San Francisco, CA  94111
    Telephone:  (415) 591-1000
10  Facsimile:  (415) 591-1400

11  Attorneys for Defendant
    MASTERCARD INTERNATIONAL INCORPORATED
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ALL DEFENDANTS' CONSOLIDATED MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS   CASE NO. C 04 0371 JW (PVT)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

I.  INTRODUCTION ............................................................................................1

II. FACTUAL BACKGROUND ...........................................................................3

    A.  Defendants' Payment Processing Systems .............................................3

    B.  Perfect 10's Adult Entertainment Business And the Allegedly
          Competing "Stolen Content Websites"......................................................5

    C.  Perfect 10's Factual Allegations .............................................................6

    D.  *Perfect 10 v. Cybernet*............................................................................6

III. ALL OF PERFECT 10'S CLAIMS FAIL BECAUSE NO DEFENDANT
     HAS A DUTY TO POLICE THE GLOBAL ECONOMY, INCLUDING THE
     INTERNET ......................................................................................................7

IV. PERFECT 10 FAILS TO STATE A CLAIM FOR CONTRIBUTORY,
     VICARIOUS, OR AIDING-AND-ABETTING LIABILITY FOR THE
     MISDEEDS OF THIRD PARTIES. ...............................................................11

    A.  Perfect 10 Has Not Alleged Facts to Support Contributory or Vicarious
          Copyright Infringement ...........................................................................11

          1.  Perfect 10 fails to state a claim for contributory infringement
               because it cannot allege that Defendants have materially
               contributed to any copyright infringement. ................................11

          2.  Perfect 10 cannot adequately plead a basis for Defendants'
               vicarious liability for copyright infringement.............................13

               a.  Perfect 10 does not allege that Defendants have the
                    requisite right and ability to control infringing activity
                    by third party merchants. ...............................................14

               b.  Perfect 10 does not allege facts to show that Defendants
                    receive a direct financial benefit from any infringement.............16

    B.  Perfect 10 Has Not Alleged Facts Supporting Its Lanham and State
          Trademark Claims ...................................................................................17

          1.  Perfect 10 has not alleged facts supporting any contributory
               trademark infringement............................................................18

                a.  Perfect 10 cannot allege that Defendants have
                    intentionally induced any merchant to infringe its
                    trademark. ......................................................................18

i

ALL DEFENDANTS' CONSOLIDATED MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS   CASE NO. C 04 0371 JW (PVT)

330585.01

**TABLE OF CONTENTS**

**Page**

        b.      Perfect 10 cannot allege that any Defendant has supplied any product used in any alleged infringement...............19

    2.      Perfect 10 cannot allege the necessary partnership with or control over any merchant needed to support a claim for vicarious trademark infringement. ..............................................21

C.      Perfect 10 Has Failed To Allege Facts Sufficient To State A Claim For Defendants' Vicarious Liability For Violation Of Publicity Rights....................22

D.      Defendants Cannot Be Liable For Violation Of Sections 17200 And 17500 Of The California Business & Professions Code...........................23

    1.      *Emery* establishes that Defendants cannot be liable under Business and Professions Code §§ 17200 or 17500 for the conduct of others...................................................................23

    2.      To the extent Perfect 10 asserts claims based on copyright infringement, these state law claims are preempted. ...............................24

    3.      The state-law unfair competition claims are congruent with Lanham Act claims and must fall with the Lanham Act claims. ..............25

V.    PERFECT 10'S LIBEL CLAIM MUST BE DISMISSED BECAUSE IT HAS NOT ALLEGED, AND CANNOT ALLEGE, FACTS  SUFFICIENT TO STATE A CLAIM FOR LIBEL. ...............................................................25

A.      Perfect 10's Libel Claim Is Time-Barred by the One-Year Statute of Limitations. ..........................................................................26

B.      Perfect 10's Libel Claim Must Be Dismissed because the Allegedly Libelous Statements Were True...............................................26

C.      Perfect 10's Libel Claim Must Be Dismissed because the Allegedly Libelous Statements Are Privileged...........................................28

D.      Perfect 10 Has Not Alleged Special Damages.......................................30

VI.   PERFECT 10'S CLAIM FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE MUST BE DISMISSED. ...............31

A.      Perfect 10's Claim is Time-Barred by the Two-Year Statute of Limitations. ..........................................................................31

B.      Perfect 10 Has Failed to Allege a Probability of Future Economic Benefit from Existing Economic Relationships.......................................31

C.      Perfect 10 Has Failed to Allege an Independently Wrongful Act. .......................33

VII.  CONCLUSION.................................................................34

ii

330585.01

1

# TABLE OF AUTHORITIES

2

**Page**

3

4

# FEDERAL CASES

5

*A & M Records, Inc. v. Abdallah*,
948 F. Supp. 1449 (C.D. Cal. 1996) ...................................................................19

6

*A&M Records Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ..............................................................9, 11, 12, 16

7

*Adobe Systems Inc. v. Canus Productions, Inc.*,
173 F. Supp. 2d 1044 (C.D. Cal. 2001) ......................................11, 13, 14, 15, 16

8

*Banff Ltd. v. Limited, Inc.*,
869 F. Supp. 1103 (S.D.N.Y. 1994) .................................................................14

9

*Cabanas v. Gloodt Associates*,
942 F. Supp. 1295 (E.D. Cal. 1996) ...............................................................28

10

*Coastal Abstract Service, Inc. v. First American Title Insurance Co.*,
173 F.3d 725 (9th Cir. 1999) ...........................................................................28

11

*Demetriades v. Kaufmann*,
690 F. Supp. 289 (S.D.N.Y. 1988) ..............................................................12, 14

12

*Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.*,
84 F.3d 1143 (9th Cir. 1996) ..........................................................................25

13

*E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A.*,
678 F. Supp. 567 (D. Md. 1988) ..........................................................................8

14

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) ....................................................................11, 13

15

*Federal Deposit Insurance Corp. v. Imperial Bank*,
859 F.2d 101 (9th Cir. 1988) ..........................................................................10

16

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
76 F.3d 259 (9th Cir. 1996) ................................................................. *passim*

17

*Frank Music Corp. v. Metropolitan-Goldwyn-Mayer Inc.*,
886 F.2d 1545 (9th Cir. 1989) ........................................................................14

18

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*
443 F.2d 1159 (2d Cir. 1971) ..........................................................................12

19

*Groubert v. Spyglass Entm't Group, LLP*,
63 U.S.P.Q.2d (BNA) 1764, 1765 (C.D. Cal. 2002) .....................................15

20

*Hard Rock Cafe Licensing Corp. v. Concession Services, Inc.*,
955 F.2d 1143 (9th Cir. 1992) .............................................................. *passim*

21

*Howard v. America Online Inc.*,
208 F.3d 741 (9th Cir. 2000) ....................................................................15, 29

22

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*,
456 U.S. 844 (1982)...........................................................................................18

23

*Jacobsen v. Marin General Hospital*,
192 F.3d 881 (9th Cir. 1999) ............................................................................7

24

25

26

27

28

iii

330585.01

1

**TABLE OF AUTHORITIES**

2

**Page**

3

*Kodadek v. MTV Networks, Inc.,*
    152 F.3d 1209 (9th Cir. 1998) ...................................................25

4

*Livnat v. Lavi,*
    46 U.S.P.Q. 2d (BNA) 1300 (S.D.N.Y. 1998)........................12

5

*Lockheed Martin Corp. v. Network Solutions, Inc.,*
    194 F.3d 980 (9th Cir. 1999) .......................................... *passim*

6

*Mattel, Inc., v. MCA Records, Inc.,*
    *28* F. Supp. 2d *1120* (C.D. Cal. 1998),
    *aff'd*, 296 F.3d 894 (9th Cir. 2002) ........................................18

7

8

*Metropolitan-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,*
    259 F. Supp. 2d 1029 (C.D. Cal. 2003) ........................9, 11, 12

9

*Mid-Cal National Bank v. Federal Reserve Bank,*
    590 F.2d 761 (9th Cir. 1979) ............................................8, 10

10

*National Bancard Corp. v. Visa U.S.A., Inc.,*
    779 F.2d 592 (11th Cir. 1986) ................................................3

11

12

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
    213 F. Supp. 2d 1146 (C.D. Cal. 2002) ................................6, 7

13

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
    167 F. Supp. 2d at 1114 (C.D. Cal. 2001) ..............................25

14

*Religious Tech. Ctr. v. Netcom On-Line Communication Services, Inc.,*
    907 F. Supp. 1361 (N.D. Cal. 1995) ..................................12, 13

15

*Sacramento Valley Chapter of National Electric Contractors Association*
    *v. International Brotherhood,*
    632 F. Supp. 1403 (E.D. Cal. 1986) .......................................7

16

17

*SCFC ILC, Inc. v Visa U.S.A., Inc.,*
    36 F.3d 958 (10th Cir. 1994) .................................................3

18

*Shapiro, Bernstein & Co. v. H.L. Green Co.,*
    316 F.2d 304 (2d Cir. 1963) ................................................13

19

*Sony Corp. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984) ..................................................... *passim*

20

21

*Vackar v. Package Machine Co.,*
    841 F. Supp. 310 (N.D. Cal. 1993) ......................................28

22

**STATE CASES**

23

*Blank v. Kirwan,*
    39 Cal. 3d 311 (1985) .........................................................32

24

*Chazen v. Centennial Bank,*
    61 Cal. App. 4th 532 (1998) ................................................10

25

26

*Cislaw v. Southland Corp.,*
    4 Cal. App. 4th at 1288 .......................................................14

27

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.,*
    11 Cal. 4th 376 (1995) ..................................................31, 33

28

iv

ALL DEFENDANTS' CONSOLIDATED MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS   CASE NO. C 04 0371 JW (PVT)

330585.01

# TABLE OF AUTHORITIES

**Page**

*Emery v. Visa International Service Association,*
95 Cal. App. 4th 952 (2002) ............................................................. *passim*

*Francis v. Dun & Bradstreet,*
3 Cal. App. 4th 535 (1992) ................................................................26

*Gantry Construction Co., Inc. v. American Pipe and Construction Co.,*
49 Cal. App. 3d 186 (1975) ...............................................................28

*Gionfriddo v. Major League Baseball,*
94 Cal. App. 4th 400 (2001) ..............................................................22

*Gomes v. Fried,*
136 Cal. App. 3d 924 (1982) .............................................................30

*JRS Products, Inc. v. Matsushita Electric Corp. of America,*
15 Cal. App. 4th 168 (2004) ..............................................................31

*Knoell v. Pertovich,*
76 Cal. App. 4th 164 (1999) ..............................................................31

*Korea Supply Co. v. Lockheed Martin Corp.,*
29 Cal. 4th 1134 (2003) ....................................................................33

*Lange v. TIG Insurance Co.,*
68 Cal. App. 4th 1179 (1998) ...........................................................33

*Leger v. Stockton Unified School District,*
202 Cal. App. 3d 1448 (1988) .............................................................7

*Noonan v. Rousselot,*
239 Cal. App. 2d 447 (1966) .............................................................29

*Palm Springs Tennis Club v. Rangel,*
73 Cal. App. 4th 1 (1999) .................................................................30

*Pavlovsky v. Board of Trade,*
171 Cal. App. 2d 110 (1959) ........................................................29, 30

*People v. Brophy,*
49 Cal. App. 2d 15 (1942) .................................................................23

*Roth v. Rhodes,*
25 Cal. App. 4th 530 (1994) ..............................................................32

*Software Design & Application Ltd. v. Hoefer & Arnett, Inc.,*
49 Cal. App. 4th 472 (1996) ..............................................................10

*Tu-Vu Drive-In Corp. v. Davies,*
66 Cal. 2d 435 (1967) .......................................................................31

*Westside Ctr. Associate v. Safeway Stores 23, Inc.,*
42 Cal. App. 4th 507 (1996) ..............................................................32

*Youst v. Longo*
43 Cal.3d 64, 71 (1987) ....................................................................32

## FEDERAL STATUTES

Copyright Act, 17 U.S.C. §301 ...........................................................25

Fed. R. Civ. P. 9(g) ..........................................................................30

v

330585.01

# TABLE OF AUTHORITIES

**Page**

## STATE STATUTES

California Business & Professions Code

§ 14335.................................................................................................17

§ 17200.................................................................................................22


California Civil Code

§ 45 ...........................................................................................25, 26, 27

§ 45a.....................................................................................................30

§ 47(c).............................................................................................28, 29

§ 48a(4)(d)........................................................................................29, 30

§ 3344...................................................................................................22


California Code of Civil Procedure

§ 339.....................................................................................................31

§ 340(c).................................................................................................26

## MISCELLANEOUS

2 Dobbs, *The Law of Torts*,
    § 314, at 853 (2001).....................................................................7, 8

*Prosser and Keeton on Torts*,
    § 53 at 356 (5th ed. 1984)...................................................................7

*Nimmer on Copyright*
    § 12.04(A)(1).....................................................................................13

Restatement (Second of Torts)

§ 314.......................................................................................................8

§ 314A....................................................................................................8

§ 315.......................................................................................................8

§ 315(a)..................................................................................................8

§ 316.......................................................................................................9

§ 317.......................................................................................................9

§ 318.......................................................................................................9

§ 319...................................................................................................8, 9

330585.01

## I.   INTRODUCTION

Plaintiff Perfect 10, Inc. publishes an adult magazine and operates an adult content website.  It claims that others in its business are infringing its copyrights and trademarks and unfairly competing with it by "stealing" unspecified Perfect 10 content.  Rather than suing those who it alleges are infringing its rights, even though it purports to have identified the infringing parties, Perfect 10 instead asks this Court to hold two bank card clearinghouse networks (Visa and MasterCard), two bank card processing companies (First Data Corporation and CardService International), and one bank that participates in the Visa and MasterCard systems (Humboldt Bank) responsible for those alleged infringements.  The sole reason for this appears to be that the alleged infringers allow consumers to charge their subscription fees on Visa and MasterCard cards.[1]

All of Perfect 10's claims fail as a matter of law.  Perfect 10's lawsuit is based upon the unsupportable notion that, by simply providing notice of its complaints, *not* to the alleged infringer, but rather to third parties that provide general business services, it can force those third parties to act as the enforcer of its rights, under pain of liability for the alleged acts of others.  No court has ever imposed such a duty as Perfect 10 seeks to establish in this case.  To the contrary, courts have consistently recognized that one cannot hold payment network providers responsible for the variety of misdeeds that may be perpetrated by users of those payment systems.  As the California Court of Appeal stated recently:

> Given the millions of merchants that use the VISA payment system and the millions of transactions it processes daily, we are unwilling to foist upon Visa the onerous role of the global policeman plaintiff seems to think it should be.

*Emery v. Visa Int'l Serv. Ass'n.*, 95 Cal. App. 4th 952, 965-66 (2002).

---

[1] Perfect 10 also asserts libel and tortious interference claims against all Defendants because years ago Perfect 10 was terminated as a Visa merchant on the ground that it suffered excessive chargebacks (charges that are reversed because cardholders claim that they were unauthorized or fraudulent) and was as a result placed on the Combined Terminated Merchant File.  Those claims are both frivolous and time-barred.  Perfect 10's Ninth Claim for Relief requests injunctive relief.  Because that Claim for Relief does not assert any particular facts or cause of action, but merely requests a remedy, the Court may dismiss or strike that Claim for Relief without the need for extended argument by Defendants.

ALL DEFENDANTS' CONSOLIDATED MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS   CASE NO. C 04 0371 JW (PVT)

1    Courts have recognized that imposing broad policing duties on banks, financial

2  institutions and "back-end" data processing entities, such as the Defendants in this case, would

3  unduly burden the national and international economy.  Yet these are exactly the economy-

4  crippling duties that Perfect 10 asks the Court to impose on Defendants.

5    Defendants are no better positioned to police every merchant that uses their payment

6  infrastructure than the local telephone company, janitorial service, or plumber.  If companies that

7  process bank card transactions are liable to Perfect 10 for third-party infringements of its rights,

8  then so too are the office supply vendor, electric utility, and accounting firm.  Each provides

9  content-neutral services to potential infringers of Perfect 10's images.  It does not follow,

10  however, that each is contributorily or vicariously liable to Perfect 10.  Under Perfect 10's logic,

11  *anyone* who does business with any alleged infringer of Perfect 10's rights, and even those like

12  Visa and MasterCard who do not do any such business directly with alleged infringers, can be

13  converted from an unrelated third-party to a tortfeasor by the simple expedient of sending a

14  letter, alleging infringement by someone else, and demanding that it step in and enforce

15  Perfect 10's rights.  Does the alleged infringer buy workstations from Sun Microsystems?  Send

16  Sun a letter, demand that Sun cease selling to the alleged infringer, and then file suit.  Does the

17  local power company provide the electricity without which the infringer could not operate?  Send

18  it a letter, and make it a defendant.  Does the infringer use the services of an accountant?  Federal

19  Express?  A janitorial service?  Pick whatever convenient defendant you choose:  under Perfect

20  10's breathtakingly broad view of contributory and vicarious liability, anyone can be nominated.

21  So long as the *defendant du jour* provides any "critical support" whatsoever to the alleged

22  infringer, Perfect 10 can hold it liable.

23    This is not the law.  No such duty to police unrelated merchants or other third parties has

24  ever been imposed upon any financial institution or payment system providers or, indeed, on any

25  person who provides legal content-neutral supplies and services to others engaged in unlawful

26  conduct.  Perfect 10 has failed to provide a basis for imposing a duty on Defendants, and has

27  failed to state any claim for which relief can be granted.  The Court should therefore dismiss the

28  action.

2

ALL DEFENDANTS' CONSOLIDATED MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS   CASE NO. C 04 0371 JW (PVT)

## II.   FACTUAL BACKGROUND

**A.   Defendants' Payment Processing Systems**

A basic understanding of the role and operation of the payment processing systems—and the similarly structured Visa and MasterCard systems in particular—is fundamental to the appropriate resolution of this case.  The Visa and MasterCard systems have been analyzed and described in detail by several courts, and alleged in Perfect 10's Complaint.[2]  Visa and MasterCard process hundreds of millions of dollars in transactions every day by acting as conduits that relay and clear transaction information among hundreds of millions of cardholders, tens of millions of merchants, and many thousands of banks worldwide.  Complaint, ¶¶ 8, 9.

The Court in *Emery* described Visa's system.  The MasterCard system is structured similarly:

> VISA provides a medium for interchange and settlement among the financial institutions that lend to consumers and transfer funds to merchants.  VISA is an international organization of over 20,000 autonomous financial institutions located in 240 countries and territories.  Through its worldwide computer system, VISA acts as a clearinghouse for credit, debit, and funds transfer transactions among its member financial institutions.  It processes over 2,700 transactions every second during its peak season. . . .
>
> VISA enters into contractual relationships with member financial institutions, authorizing them to use the VISA payment system and the VISA mark.  "Acquiring" member institutions then enter into separate contracts with merchants to display the VISA mark and to accept, in lieu of cash, VISA bank cards as a form of payment.  "Issuing" member institutions enter into contracts with consumers whereby consumers obtain their VISA bank cards.  VISA does not set the interest rate or any of the terms and conditions of the consumer's card.
>
> . . . .
>
> As a consequence, VISA is not involved either in transferring funds to merchants or in billing cardholders.  Nor does VISA receive any fee from either the cardholder or the merchant involved in a particular transaction.

*Emery*, 95 Cal. App. 4th at 956.

Perfect 10's Complaint describes a typical transaction as follows:  The customer presents the merchant with her payment card.  The merchant then presents the payment card to either a third-party processor (such as First Data or CardService) or to the merchant's Visa- or

---

[2]  *See, e.g., Emery*, 95 Cal. App. 4th 952 (2002); *National Bancard Corp. v. Visa U.S.A., Inc.*, 779 F.2d 592 (11th Cir. 1986); *SCFC ILC, Inc. v Visa U.S.A., Inc.*, 36 F.3d 958 (10th Cir. 1994).

3

1   MasterCard-affiliated bank (the "acquiring" bank) (such as Humboldt).  The information is

2   relayed to Visa or MasterCard, which automatically relays the information to the member bank

3   that issued the customer her payment card (the issuing bank).  The customer's issuing bank either

4   authorizes or denies the transaction and relays the appropriate information through Visa or

5   MasterCard back to the merchant's acquiring bank.  The acquiring bank then relays the

6   information back to the merchant.  Visa or MasterCard then provides the data that allow the two

7   interested banks to "settle" the resulting debits and credits between themselves.  Complaint, ¶ 11.

8   Each of these millions of daily transactions is completed in seconds.

9          Defendants enable transaction authorization and interchange of funds as well as the

10   settlement of the debits and credits among members that arise from the millions of bank card

11   transactions that occur each day across the globe.  Thus, through their worldwide computer

12   systems, Defendants act as important clearinghouses for credit, debit and funds transfer

13   transactions data exchanged by their member financial institutions.  **Throughout this process,**

14   **Visa and MasterCard have no direct relationship or contact with any merchants or**

15   **consumers, all such contact being in the hands of member financial institutions.**[3]  The Visa

16   and MasterCard systems instead provide a medium for interchange and settlement among the

17   banks that do perform these functions, under strict government regulation.

18          According to the Complaint, Defendants' rules also provide that member banks must

19   terminate the accounts of merchants whose "chargeback" ratios exceed allowable limits.

20   Complaint, ¶ 11.  Merchants whose accounts are terminated are listed by member banks on the

21   Combined Terminated Merchant File ("CTMF"), which is alleged to be published by Visa and

22   MasterCard.  *Id*. at ¶ 12.

23

24

---

25   [3] The allegations in Perfect 10's Complaint do not distinguish among the Defendants in terms of
      the different roles each plays in the payment card processing industry.  Visa and MasterCard, for
26   instance, do not have any contact with merchants or consumers, while FDC, CardService and
      Humboldt have limited, content-neutral, contact with merchants.  For the purposes of this motion
27   to dismiss, however, the differences among the Defendants are irrelevant, as all of the allegations
      of the Complaint (and thus all of the legal arguments made in this brief) are directed to all of the
28   Defendants.

ALL DEFENDANTS' CONSOLIDATED MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS   CASE NO. C 04 0371 JW (PVT)

**B.      Perfect 10's Adult Entertainment Business And the Allegedly Competing "Stolen Content Websites"**

Perfect 10 is an "adult entertainment" business.  Complaint, ¶ 39.  Perfect 10 publishes the magazine *Perfect 10* and owns an adult entertainment internet website of the same name.  *Id*.  As such, Perfect 10 claims it designs, films, produces and promotes a variety of adult entertainment products, including nude photographs, magazines, and videos.  Complaint, ¶ 40.

Perfect 10 claims it owns and has attached to the Complaint copyright registrations for many of its photographic images.  Complaint, ¶ 74, Exs. 8-9.  Additionally, Perfect 10 claims it owns a federal trademark registration for the PERFECT 10 mark that is used in connection with its adult entertainment products and services.  Complaint, ¶ 42.  Perfect 10 also purportedly owns the rights of publicity of many of the models that appear in its photographic works through assignment.  Complaint, ¶ 44.

Perfect 10 does *not*, however, allege that it owns or has any rights to the "celebrities" whose images and rights of publicity are allegedly infringed by the few websites that are specifically identified in the Complaint, so-called "Stolen Content Websites."  Complaint, ¶¶ 6, 20.  Perfect 10 does not presume to allege that *any* "Stolen Content Website" is affiliated with any Defendant.  *See, e.g.,* Complaint, ¶¶ 20, 52-53.  Perfect 10 has not specifically identified, either in its Complaint or in any of the letters or emails sent to any Defendant (*see* Complaint, Ex. 5), *even one* "Stolen Content Website" infringing any trademark, copyright or other right belonging to Perfect 10.

Perfect 10 further asserts (without any ownership rights to protect), that the "Stolen Content Websites" violate the rights of publicity of certain mainstream and adult actresses.  Complaint, ¶ 20.  Again, Perfect 10 does not allege that it owns these actresses' rights of publicity.  These websites allegedly charge a "membership fee" to consumers to view a wide variety of adult content—including the allegedly infringing images.  Complaint, ¶ 81.  The websites provide numerous payment options.  Some—but by no means all—of these membership fees are processed using "back-end" data transaction processing networks provided by one or more Defendants.

5

## C.     Perfect 10's Factual Allegations

Perfect 10 alleges Defendants are vicariously and contributorily liable for providing "critical support" to numerous independent "Stolen Content Websites" that allegedly infringe Perfect 10's rights.  Complaint, ¶ 20.  Despite its length and conclusory rhetoric, the Complaint actually contains only *one*, solitary factual allegation on which its claims of "critical support" rely:  that Defendants process the bank card transactions of allegedly infringing third parties.  *See e.g.* Complaint ¶¶ 55(b) (Defendants "facilitat[e]" bank card processing), 56 (same), 59 (Defendants "processes transactions").  The Complaint does not allege, because it cannot, that Defendants review the data transmitted, have control over the individual transactions, or have any control over the infringing activities.  Defendants have absolutely no role in creating, displaying, hosting, transmitting or promoting the content complained about—and Perfect 10 does not contend that they do.  Rather, Perfect 10 simply asserts that Defendants act as conduits of payment transaction information, and that they should be liable to Perfect 10 if they do not stop providing their services to third-party businesses.

The Complaint further alleges that, in 2001, Perfect 10 was terminated as an approved merchant because it had excessive "chargebacks."  Complaint, ¶¶ 28, 72.  Even though Perfect 10 admits its chargebacks actually *did* exceed the allowed level, and even though it was therefore appropriately terminated (*id.* at ¶¶ 28, 144), Perfect 10 claims it was "libeled" when its name was placed on a register of terminated merchants.

## D.     *Perfect 10 v. Cybernet*

Perfect 10 will doubtless attempt to rely on a preliminary ruling in another easily distinguishable case it brought as part of its effort to hold responsible entities remotely connected to the activities of the direct infringers:  *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002).  In that case, the Central District of California found that Cybernet was likely to be found liable for contributory and vicarious copyright infringement.  *Id.* at 1182.  Notably, the *Cybernet* case is materially different from the present case.  Cybernet provided technical and content advice directly to its customers, the individual infringing websites, reviewed the infringing sites, paid webmasters commissions, provided links and access to

1   challenged web sites, operated a search engine for its customers that searched those web sites,

2   assigned the infringing web sites keywords to promote the efficiency of its search engine, and

3   attempted to control the quality of the websites.  *Id*. at 1170-71.  In contrast to the substantial

4   direct involvement that Cybernet had in the activities of the direct infringers, Perfect 10 does not

5   (and cannot) allege that Defendants had any direct involvement with the allegedly infringing

6   merchants in this case.

### III.   ALL OF PERFECT 10'S CLAIMS FAIL BECAUSE NO DEFENDANT HAS A DUTY TO POLICE THE GLOBAL ECONOMY, INCLUDING THE INTERNET

9   Defendants can only be liable under *any* of Perfect 10's causes of action if they owed a

10   legal duty to Perfect 10.  Perfect 10 has not—and cannot—allege that any Defendant owes

11   Perfect 10 any duty to investigate, control and cease providing payment transaction processing

12   services to a few "bad" merchants among the many millions that use Defendants' services.

13   Perfect 10 would impose on Defendants the burden of investigating and judging complex factual

14   matters relating to the highly specialized and ever evolving law of intellectual property on the

15   internet.

16   It is black letter law that "'[d]uty' is a question of whether the defendant is under any

17   obligation for the benefit of the particular plaintiff."  *Prosser and Keeton on Torts*, § 53 at 356

18   (5th ed. 1984).[4]  Duty is a question of law for the court to decide.[5]  The general rule is that

19   "[u]nless the defendant has assumed a duty to act, or stands in a special relationship to the

20   plaintiff, defendants are not liable in tort for a pure failure to act for the plaintiff's benefit."

21   2 Dobbs, *The Law of Torts*, § 314, at 853 (2001).  Thus, Perfect 10 may not create a duty where

22   the requisite "special relationship" does not exist, simply by purporting to put Defendants "on

---

23   [4] Neither the federal trademark or copyright statutes Perfect 10 sued under explicitly create

24   vicarious or contributory liability.  *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 (1984); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261 (9th Cir. 1996).  The federal

25   courts have been influenced by state common law theories to find the very limited situations in which persons who do not engage directly in infringements have a duty to police or control

26   others, typically lessees, or subsidiaries and business partners.  *See also Hard Rock Cafe Licensing Corp.  v. Concession Services, Inc.*, 955 F.2d 1143, 1148-49 (9th Cir. 1992).

27   [5] *Jacobsen v. Marin Gen. Hosp.*, 192 F.3d 881, 885 (9th Cir. 1999); *Sacramento Valley Chapter of Nat'l Elec. Contractors Ass'n. v. Int'l Brotherhood*, 632 F. Supp. 1403, 1409 n. 11 (E.D. Cal.

28   1986); *Leger v. Stockton Unified School Dist.*, 202 Cal. App. 3d 1448, 1458 (1988).

330585.01

notice" of a threatened injury.  Complaint, ¶¶ 61-65 and Ex. 5.[6]  Defendants should not, cannot and do not owe Perfect 10 any legal duty to act as a policeman and enforce Perfect 10's trademarks, copyrights and alleged rights of publicity assigned by Perfect 10's "models."  While Perfect 10 has asserted ten different claims for relief, all with their individual "elements," the Court need not parse down to that level, for the simple reason that Perfect 10 has not alleged facts creating a legally enforceable duty owed by any Defendant to Perfect 10.

The general rule, that there is no duty to police or halt other's unlawful acts absent a special relationship, either with the plaintiff or the actor, is the common law in every jurisdiction. Restatement (Second) of Torts § 314; *see also, e.g., Mid-Cal Nat'l Bank v. Federal Reserve Bank*, 590 F.2d 761, 763 (9th Cir. 1979).  The Restatement provides that even though the defendant "realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."  Restatement (Second) of Torts § 314.  As the Ninth Circuit recognized in *Mid-Cal,* a duty to police others may result only if the defendant stands in a special relationship to the party claiming protection, as, for example, an employer to an injured employee.  *Mid-Cal*, 590 F.2d at 763, *see also* Restatement (Second) of Torts §§ 314A, 315.  The Ninth Circuit adopted the same approach in rejecting a claim of contributory trademark infringement in *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999), when it recognized that "the legal duty owed by a landlord to control illegal activities on his or her premises" could not extend to a provider of internet routing services.

Simply put, Perfect 10 nowhere alleges the requisite "special relationship exist[ing] between [Defendants] and the [Stolen Content Website merchants] which imposes a duty upon [Defendants] to control the third person's conduct."  Restatement (Second) of Torts § 315(a).

---

[6] "The fact that the defendant foresees harm to a particular individual from his failure to act does not change the general rule."  2 Dobbs, *Law of Torts* at 853. *See also* Restatement (Second) of Torts §§ 314-319; *Mid-Cal Nat'l Bank v. Federal Reserve Bank*, 590 F.2d 761, 763 (9th Cir. 1979) (bank had no duty to stop or protect other bank from known check-kiting scheme); *E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A.*, 678 F. Supp. 567, 577 (D. Md. 1988) (no duty owed as a result of bank's knowledge or suspicion of customer's fraudulent scheme); *Emery*, 95 Cal. App. 4th at 966 (refusing to "foist upon VISA the onerous role of the global policeman.").

8

1   Perfect 10 has not alleged, and cannot allege, any such special relationship, sufficient to create a

2   duty to police or control, between Defendants and *any* merchant that utilizes Defendants'

3   services.  The only relationships which create a duty to control the conduct of a third-party actor

4   are (1) parents; (2) masters; (3) landowners; and (4) persons who have assumed custody over the

5   actor.  Restatement (Second) of Torts §§ 316-319.  Defendants are not alleged to have any such

6   relationships with any of the "Stolen Content Website" merchants.  The only alleged link these

7   merchants—a tiny fraction of the many millions of retailers that participate in the Defendants'

8   systems—have to Defendants is the indirect one through which Defendants process the

9   merchants' transactions.  Complaint, ¶¶ 8-9, 46-48; *see also Emery*, 95 Cal. App. 4th at 956.  As

10  Perfect 10 alleges, Defendants have done nothing more than provide those payment transaction

11  processing networks, i.e., Defendants have supplied content-neutral "back-end" accounting

12  networks to process transactions for merchants.  Defendants' provision of these services does

13  not, as a matter of law, result in a relationship with those millions of merchants significant to

14  impose any duty flowing to Perfect 10.  *Lockheed,* 194 F.3d at 984*; Emery,* 95 Cal. App. 4th at

15  966.

16          Adapting the common-law rule that landowners may be under a duty to control their

17  tenants, a number of federal courts have recognized that secondary liability can be imposed on

18  internet service providers, online bulletin boards and other "digital real estate" providers who,

19  like real estate lessors, provide the "site and facilities" used by others to infringe.  *See, e.g., A&M*

20  *Records Inc. v. Napster, Inc.,* 239 F.3d 1004, 1022 (9th Cir. 2001); *Fonovisa,* 76 F.3d at 264;

21  *Hard Rock Cafe,* 955 F.2d at 1148-49; *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,

22  259 F. Supp. 2d 1029, 1038 (C.D. Cal. 2003).  But Perfect 10 does not (and cannot) allege that

23  Defendants here are landlords—real or digital—of infringement sites or facilities and no reported

24  copyright or trademark case has extended duty or vicarious liability to financial institutions or

25  other arms-length providers of content-neutral services.  Indeed to do so would be directly

26  contrary to the teachings of *Sony Corp.*, 464 U.S. 417, since there are many non-infringing uses

27  for the transaction processing networks Defendants provide.  In *Sony Corp.*, the Supreme Court

28  ruled that an arms-length provider of equipment actually used by many purchasers to commit

9

330585.01

infringement could not be secondarily liable, since there were substantial non-infringing uses. *Sony Corp.*, 464 U.S. at 456.  Certainly no more onerous duty can be applied to Defendants, who supply content-neutral networks that Perfect 10 admits are used by many millions of admittedly law abiding merchants.

A long line of cases, including *Mid-Cal*, have held that a financial institution does "not have a special relationship with its depositors such that the bank had a duty to control their conduct for the benefit" of unrelated persons such as Perfect 10.  *Mid-Cal,* 590 F.2d at 763; *see also Federal Deposit Ins. Corp. v. Imperial Bank*, 859 F.2d 101, 104 (9th Cir. 1988) (no duty owed because no special relationship); *Emery*, 95 Cal. App. 4th at 962 (Visa not responsible for monitoring or policing merchants authorized to accept Visa payment cards); *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 537-38 (1998) (no duty to police or supervise depositors' accounts or account activities).

The sound policy reasons for not extending policing duties to banks apply equally to payment system providers such as Defendants.  As the court explained in *Mid-Cal*, to impose account policing duties on a financial institution "would be to alter radically the nature of banking and the general conduct of business.  Such an alteration is neither necessary nor warranted."  *Mid-Cal*, 590 F.2d at 763.  Similarly, the policy reasons enunciated by the California Court of Appeal in a recent case apply equally to Defendants' banking-related, payment transaction processing services:

> The present banking system under which an enormous number of checks are processed daily could not function effectively if banks were not required to make prompt and effective decisions on whether to pay or dishonor checks. . . .  Under this system favoring expedited handling of funds transfers, a bank cannot be expected to track transactions in fiduciary accounts or to intervene in suspicious activities.

*Chazen*, 61 Cal. App. 4th at 539; *see also Software Design & Application Ltd. v. Hoefer & Arnett, Inc.*, 49 Cal. App. 4th 472, 481-83 (1996).  Finally, as the California Court of Appeal explained in refusing to impose a duty upon Visa to monitor and police merchants serviced by its member banks:

> For a bank to be liable even potentially to undisclosed principals would force it to investigate the background of other entities or persons.  Forcing an issuing bank

10

330585.01

into this investigative role would conflict with the goals of increasing the efficiency of commercial transactions, and limiting the liability of issuing banks.

*Emery*, 95 Cal. App. 4th at 963 (quoting *Kools v. Citibank, N.A.*, 872 F. Supp 67, 72 (S.D.N.Y. 1995).

### IV.   PERFECT 10 FAILS TO STATE A CLAIM FOR CONTRIBUTORY, VICARIOUS, OR AIDING-AND-ABETTING LIABILITY FOR THE MISDEEDS OF THIRD PARTIES.

**A.   Perfect 10 Has Not Alleged Facts to Support Contributory or Vicarious Copyright Infringement**

Perfect 10 nowhere attempts to allege that any named Defendant has directly engaged in any copyright violation.  Perfect 10 instead is attempting to pursue the two forms of third-party liability for copyright infringement recognized in the case law but not codified in the Copyright Act:  vicarious liability, which is "derived from the similar concept in the law of employer-employee relations; and contributory infringement derived from the tort concept of enterprise liability."  *Adobe Systems Inc. v. Canus Productions*, *Inc.*, 173 F. Supp. 2d 1044, 1048 (C.D. Cal. 2001).[7]

**1.   Perfect 10 fails to state a claim for contributory infringement because it cannot allege that Defendants have materially contributed to any copyright infringement.**

Liability for contributory infringement requires proof of two things in addition to direct infringement by a third party:  (1) that defendants had actual knowledge of the third party's direct infringement; and (2) that defendants induced, caused or "materially contribute[d] to the infringing conduct of *another*."  *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)

---

[7] *See id.* at 1049-1050; *see also Napster,* 239 F.3d at 1013 n.2 ("secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party."); *Grokster*, 259 F. Supp. 2d at 1035 (C.D. Cal. 2003); *Fonovisa,* 76 F.3d at 262-63.

11

330585.01

(emphasis in original).  Perfect 10's allegations do not meet either of these two elements.  For purposes of this motion, Defendants focus on the second prong.[8]

Perfect 10's assertion that Defendants "provide critical support" for merchants that operate allegedly infringing websites falls far short of alleging facts that demonstrate a "material contribution" by Defendants to infringing activity.  As one court recently explained:

> Participation sufficient to establish a claim of contributory infringement may not consist of merely providing the "means to accomplish an infringing activity …" *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 n.17 (1984).  In order for liability to be imposed, the alleged *contributory infringer must make more than a "mere quantitative contribution" to the primary infringement*. *Gershwin*, 443 F.2d at 1162.  Participation in the infringement must be "substantial."  *Demetriades v. Kaufmann*, 690 F. Supp. 289, 294 (S.D.N.Y. 1988).  The authorization or assistance must bear *a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer*.

*Livnat v. Lavi*, 46 U.S.P.Q. 2d (BNA) 1300, 1303 (S.D.N.Y. 1998) (emphasis added) (citations omitted).

The "material contribution" requirement is rooted in the notion that "one who directly contributes to another's infringement should be held accountable."  *Fonovisa*, 76 F.3d at 264.  Material contribution may be found only when the defendant "engages in personal conduct that *encourages* or *assists* the infringement."  *Napster*, 239 F.3d at 1019 (emphasis added); *Grokster*, 259 F. Supp. 2d at 1038.

"Material contribution" is more than passive participation.  *See Fonovisa*, 76 F.3d at 264.  Material contribution has been found only where the defendant was actively involved in supporting and enabling *the infringing activity*.  It has also been found where the defendant has provided hosting services that are engaged in distribution of the infringing material.  *See Religious Tech. Ctr. v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361, 1375 (N.D. Cal. 1995).  In that case, Judge Whyte explained that "[w]here a defendant has knowledge

---

[8] The Court should dismiss the copyright infringement claim also because Perfect 10 has failed adequately to allege particular direct infringements upon which the claim for contributory infringement liability rests.  Perfect 10 also fails to identify which Defendants are responsible for which infringements.  To the extent the Court is inclined to deny the motion to dismiss with respect to copyright infringement, Defendants request that the Court, in the alternative, require a more definite statement and order Perfect 10 to identify (a) the underlying infringements, (b) the merchants allegedly involved with each, (c) the Defendant(s) associated with each infringement,

12

ALL DEFENDANTS' CONSOLIDATED MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS   CASE NO. C 04 0371 JW (PVT)

330585.01

1  of the primary infringer's infringing activities, it will be liable if it 'induces, causes or materially

2  contributes to *the infringing conduct of'* the primary infringer. Such participation must be

3  substantial." *Netcom,* 907 F. Supp. at 1375 (emphasis added) (quoting *Gershwin,* 443 F.2d at

4  1162).

5  Here, Perfect 10 alleges that Defendants provide critical support (by "facilitating"

6  transactions) for the businesses it challenges, but it does not allege (and cannot allege) that

7  Defendants substantially participate in the *infringing activity.* This distinction is critical.

8  Copyright law does not demand a blockade of companies that are alleged to engage in infringing

9  activity by imposing contributory infringement liability on vendors that do business with those

10  companies. Copyright law merely forbids the substantial participation by others in infringing

11  activity. Because Perfect 10 cannot allege substantial participation by any Defendant in any

12  infringing activity of third parties, the copyright claim must be dismissed.

13      **2.  Perfect 10 cannot adequately plead a basis for Defendants' vicarious liability**
14            **for copyright infringement.**

15  For a defendant to be vicariously liable for copyright infringement, the plaintiff must

16  prove (1) that the defendant possesses the *right and ability* to supervise the infringing conduct

17  and (2) that the defendant has an *obvious and direct financial interest* in the infringing activity.

18  *Ellison,* 357 F.3d at 1078; *Adobe Systems*, 173 F. Supp. 2d at 1049; 3 Nimmer on Copyright

19  § 12.04(A)(1). "Vicarious copyright liability is an "outgrowth" of the common law doctrine of

20  *respondeat superior*, which holds the employer liable for the acts of its agents." *Adobe Systems*,

21  173 F. Supp. 2d at 1049 (quoting *Fonovisa*, 76 F.3d at 262). Finding a third party vicariously

22  liable is appropriate only "[w]hen the right and ability to supervise coalesce with an obvious and

23  direct financial interest in the exploitation of copyrighted materials." *Shapiro, Bernstein & Co.*

24  *v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963).

28  and (d) the assistance allegedly furnished by the Defendant(s) to each underlying infringement.

1

a.      **Perfect 10 does not allege that Defendants have the requisite right and
ability to control infringing activity by third party merchants.**

2

3          Defendants do not have the requisite right and ability to supervise and control the

4   infringing conduct.  "[T]he spectrum of control has, at one end, the landlord-tenant model,

5   usually representing minimal ability of the premises owner to control the infringing activities of

6   someone using his premises; and, at the other end, the employer-employee model, which

7   represents maximum control by the premises owner."  *Adobe Systems*, 173 F. Supp. 2d at 1053.

8   Defendants are nowhere on this spectrum.  Defendants are not employers or landlords at all.

9   Defendants do not have any editorial or other control rights over the design, hosting or

10  transmission of any graphical materials, or any ability to dictate content, services or product sold,

11  or any aspect of operation.  *See Emery,* 95 Cal. App. 4th at 960-61; *Cislaw v. Southland Corp.,* 4

12  Cal. App. 4th at 1288, 1296 (1992).  No facts are alleged that would allow the finding of any

13  control over any alleged "Stolen Content Website."

14         Moreover, the control must be *related to* the infringing activity to support vicarious

15  liability.  Even in the parent-subsidiary corporate context, "a parent corporation *cannot* be held

16  liable for the infringing actions of its subsidiary *unless* there is a substantial and continuing

17  connection between the two *with respect to the infringing acts*."  *Frank Music Corp. v. Metro-*

18  *Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1553 (9th Cir. 1989) (emphasis added).  "[T]here must be

19  indicia beyond the mere legal relationship showing that the parent is actually involved with the

20  decisions, processes, or personnel *directly responsible for the infringing activity*."  *Banff Ltd. v.*

21  *Limited, Inc.*, 869 F. Supp. 1103, 1109 (S.D.N.Y. 1994) (emphasis added).  In following *Frank*

22  *Music*, the district court in *Banff* explained that "the parties' paths must cross on a daily basis,

23  and the character of this intersection must be such that the party against whom liability is sought

24  must be in a position to control the personnel and *activities responsible for the direct*

25  *infringement*."  *Banff*, 869 F. Supp. at 1109 (emphasis added); *see also Demetriades,* 690

26  F.Supp. at 293-94.

27         "[P]ervasive participation" in the business of the infringing party is required to find the

28  requisite "right and ability to control."  *Adobe Systems*, 173 F. Supp. 2d at 1053.  In *Adobe*

14

330585.01

1    *Systems*, the court determined that the trade show operator did not have sufficient control to

2    support a finding of vicarious liability.  The defendant trade show operator did "not possess the

3    practical right and ability to control the sale of infringing products at its shows; and [defendant

4    did] not act with 'pervasive participation' in the business of the infringing vendors."  *Id*.

5         Although Perfect 10 puts forth conclusory allegations that Defendants have the "right and

6    ability to supervise," the Court should not accept these conclusions, especially as they contradict

7    the only specific *fact* alleged—that Defendants do nothing more than provide "back-end"

8    transaction processing services, having nothing to do with, and no control over, website content

9    preparation or editing.[9]  The facts alleged do not support a conclusion that Defendants have the

10   right and ability to supervise the infringing activity.  All that Defendants do is provide

11   merchants' banks with a system for processing and clearing credit transactions.  Complaint, ¶¶ 8-

12   9, 46-48.[10]

13        As a result, the Complaint has not alleged facts supporting any conclusion that

14   Defendants have the requisite "right and ability to control" the infringing activity sufficient to

15   support a claim for vicarious copyright infringement liability.

---

16   [9] For purposes of a motion to dismiss, the court construes the complaint in the light most

17   favorable to the plaintiff, but the complaint must allege "specific wrongdoing sufficient to state a
     claim for relief."  *Groubert v. Spyglass Entm't Group, LLP*, 63 U.S.P.Q.2d (BNA) 1764, 1765

18   (C.D. Cal. 2002).  "Conclusory allegations are insufficient to preclude dismissal" and are ignored
     in considering a Rule 12(b)(6) motion to dismiss.  *Howard v. America Online*, 208 F.3d 741, 750

19   (9th Cir. 2000).  The only specific factual allegations concerning Defendants are that they
     provided content-neutral financial services – "back-end" credit transaction processing – to

20   completely unrelated and unidentified "Stolen Content Websites."  *See e.g.* Complaint,  55(b),
     56, 59.  This is the same content-neutral service that Defendants supply millions of times per day

21   for millions of merchants in the United States and globally—as Perfect 10 admits.  Complaint,
     ¶ 8.  These completely neutral arms-length service functions cannot create liability, or the "right

22   and ability to supervise," nor has Perfect 10 alleged specific facts that support that—or other—
     improper conclusions alleged in its Complaint.  The case law is clear that Perfect 10 may not rely

23   on allegations of "aiding and abetting," "conspiracy," alleged provision of "critical support," or
     other conclusory allegations as a substitute for the required specific factual allegations to support

24   its copyright and other claims.

25   [10] The closest allegation of any control is the statement (one that is in fact false but which must
     be treated as true for purposes of the present motion) that Visa reviews and approves content of

26   the websites.  Complaint, ¶ 71.  However, even if Visa initially reviewed the website content as
     alleged, Visa would have no control over the infringing activity.  And, even if Visa were to

27   review the sites prior to allowing the merchants to process Visa-branded cards, there is no
     allegation that Visa could identify the infringing materials if any existed.  Importantly, without

28   Visa's system the infringing activity would continue to take place.  (Perfect 10 makes no similar
     allegations against the other Defendants.)

---

15

330585.01

**b.    Perfect 10 does not allege facts to show that Defendants receive a direct financial benefit from any infringement.**

Perfect 10 has failed to allege facts establishing a requisite direct causal relationship between the alleged infringing activities and Defendants' compensation for processing credits and debits.  Perfect 10 alleges that "Defendants derived substantial financial benefit from infringement of Perfect 10's copyrights, in that, . . .  the availability of approximately 20,000 Perfect 10 images on the Stolen Content Websites acted as a draw for members who pay subscription fees, a portion of which fees are *ultimately* earned by Defendants."  Complaint, ¶ 81 (emphasis added).  Perfect 10's reliance upon "ultimate" earnings by Defendants demonstrates its inability to allege a "direct" financial benefit as required by law.

There must be a symbiotic relationship between the direct infringers and another third party for the second party to be liable.  *Adobe System*s, 173 F. Supp. 2d at 1051.  For liability to be imposed on the second party, its relationship with the direct infringer must be "more than a mere financial benefit to the landlord because the very success of the landlord's venture depends on the counterfeiting activity."  *Id*.  In cases where an adequate financial benefit to support liability has been found, the defendant's financial benefit is derived from the fact that its services are used for the purpose of the infringing activity.  In *Fonovisa*, the landlord provided the physical facilities for distribution of counterfeit goods.  *Fonovisa*, 76 F.3d at 261.  In *Napster*, the defendant provided a central index of locations of infringing files that was the linchpin of the file-sharing system.  *Napster*, 239 F.3d at 1011.

Perfect 10 does not (and cannot) allege that Defendants provide a site, method, or tool for infringing activities.  Perfect 10's own allegations make clear that Defendants do not enjoy a "symbiotic" relationship with any "Stolen Content Websites."  *Adobe Systems*, 173 F. Supp. 2d at 1053.  There is no allegation that Defendants have a direct relationship with the infringing websites.  Perfect 10 merely alleges that Defendants have a relationship with its member banks,

16

1   not with any individual merchants.[11]  Defendants do not receive any direct financial benefit from

2   any "Stolen Content Websites."

3          Defendants are simply too far removed from the infringing activity to be held

4   accountable.  Although Defendants may eventually receive some financial benefit from the use

5   of payment cards as fees are passed from one member of the payment processing network to

6   another and as charges are collected from cardholders, Defendants' role in the processing of the

7   transaction is not tied in any way to the infringing activity.  In short, Perfect 10 has not alleged—

8   and cannot allege—facts supporting any conclusion that any Defendant has obtained "obvious or

9   direct financial benefit" from the infringing activity.  Thus, this claim should be dismissed.

10  **B.     Perfect 10 Has Not Alleged Facts Supporting Its Lanham Act and State Trademark
        Claims**

11

12         Perfect 10 has not alleged that Defendants used its alleged trademarks—"PERFECT 10"

13  and "perfect10.com"—in any manner whatsoever.  Thus, even assuming there is an underlying

14  direct infringement, Perfect 10's claims of trademark infringement, trademark disparagement,

15  and wrongful use of a registered trademark can only be based on theories of contributory or

16  vicarious liability.

17         Liability for indirect infringers is even narrower under trademark law than under

18  copyright law.  *See Sony Corp.*, 464 U.S. at 439; *Fonovisa*, 76 F.3d at 265 (recognizing that

19  secondary trademark infringement liability is more narrowly circumscribed than copyright

20  infringement); *Hard Rock Cafe,* 955 F.2d at 1150 (limiting vicarious liability to those acting in

21  "apparent or actual partnership").  Because Perfect 10 has failed to allege facts sufficient to

22  support a claim for contributory or vicarious liability for copyright infringement, it necessarily

23  has failed to allege facts sufficient to support claims of trademark infringement based on third

24  party liability.  As discussed below, because Perfect 10 has not alleged facts demonstrating that

25

26

27  ─────────────────────
    [11] In the case of Defendant Humboldt, Perfect 10 alleges merely that Humboldt is itself a
28  member bank, without any allegation of any relationship between Humboldt and any alleged
    infringer.

─────────────────────
                                        17
ALL DEFENDANTS' CONSOLIDATED MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS   CASE NO. C 04 0371 JW (PVT)

any Defendant had the necessary relationship, with any infringing website, to support its claim of either contributory or vicarious liability, each of its trademark claims should be dismissed.[12]

### 1. Perfect 10 has not alleged facts supporting any contributory trademark infringement.

The Supreme Court considered contributory liability for trademark infringement in *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844 (1982). The defendant in *Inwood* manufactured and distributed a generic drug to independent pharmacists who mislabeled the drug on resale, infringing the plaintiff's trademark. *Inwood*, 456 U.S. at 854. Plaintiff urged that Inwood Laboratories, the supplier of the generic drug, should also be liable. The Supreme Court refused to hold Inwood liable, explaining the test for imposing secondary liability as follows:

> [W]hether [Inwood] was liable for the pharmacist's infringing acts depended upon whether, in fact, [defendant] (1) intentionally induced the pharmacists to mislabel generic drugs or, in fact (2) continued to supply cyclandelate to pharmacists whom the petitioner *knew* were mislabeling generic drugs.

*Id.* at 855 (emphasis added). In other words, there can be no contributory trademark liability on the part of Defendants unless they (1) actively *induced* particular merchants to infringe the Perfect 10 trademarks or (2) knew that particular merchants were reselling or somehow using Defendants' supplied products *as part of their infringing conduct*. Perfect 10 has not alleged facts sufficient to support either potential basis for contributory liability under the trademark or Lanham Act. *See also Lockheed Martin*, 194 F.3d at 983-84.

### a. Perfect 10 cannot allege that Defendants have intentionally induced any merchant to infringe its trademark.

The first basis for liability enunciated in *Inwood*, intentional inducement to infringe, is not even arguably alleged in Perfect 10's Complaint. Perfect 10 simply has not alleged any facts that would lend support to a claim that any Defendant has intentionally induced any merchants to

---

[12] While the discussion in this brief focuses on federal law, a state claim for wrongful use of a registered mark under Cal. Bus. & Prof. Code § 14335 is governed by the same standards. *See Mattel, Inc., v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1144 n. 30 (C.D. Cal. 1998), *aff'd*, 296 F.3d 894 (9th Cir. 2002).

use—much much less infringe—any Perfect 10 trademark.  Thus, the first basis for secondary

liability enunciated in *Inwood* cannot apply in this case.

### b.  Perfect 10 cannot allege that any Defendant has supplied any product used in any alleged infringement.

The second possible basis for potential trademark liability recognized in *Inwood*—more

pertinent in this dispute with Perfect 10—requires that the contributory infringer supply its

product to a person knowing that *the supplier's product* will be used directly to infringe

another's right.  As the Ninth Circuit explained in *Fonovisa,* contributory liability can exist only

if the defendant "continues to supply a product knowing that the recipient is *using the product to

engage in trademark infringement*."  *Fonovisa,* 76 F.3d at 264.[13]  For example, a defendant has

been found liable for continuing to provide "blank, time-loaded cassettes to his customers even

though he knew that they used the cassettes to engage in trademark infringement."  *A & M

Records, Inc. v. Abdallah,* 948 F. Supp. 1449, 1457 (C.D. Cal. 1996).

Those who provide "services" to the direct infringer are liable only if the service supplier

directly controls and monitors *the instrumentality used by a third party to infringe the trademark.*

*Fonovisa,* 76 F.3d at 264 (explaining that "providing the site and facilities for known infringing

activity is sufficient to establish contributory liability").  The Ninth Circuit has instructed that

when "weighing a fact pattern in the contributory infringement context . . . [the court must]

consider the extent of control exercised by the defendant over the third-party's *means of

infringement*."  *Lockheed Martin,* 194 F.3d at 984 (emphasis added).

*Lockheed Martin* is directly analogous to this case.  There, defendant NSI was the sole

contractor in charge of registering internet domain names, processing approximately 130,000

registrations monthly.  *Lockheed Martin,* 194 F.3d at 982.  Even though Lockheed had put NSI

on notice that a number of domain name registrations infringed Lockheed's "Skunk Works"

trademark (*id.* at 983), the Ninth Circuit ruled that NSI could not be liable for trademark

330585.01

violations, as it was providing a service, not a product, and because NSI, as a non-landlord service provider, owed no duty to Lockheed to police those to whom it provided registration services.  *Id*. at 984-85.  The court also explained that, as in this case, "the 'direct control and monitoring' rule established by *Hard Rock* and *Fonovisa*" was not met, because "NSI's rote translation service does not entail the kind of direct control and monitoring required to justify extension of the [*Inwood*] 'supplies a product' requirement."  *Id*. at 985.

The Ninth Circuit also recognized that the direct control and monitoring required under *Fonovisa* to support contributory trademark infringement would be impossible as applied to the provision of internet services.  *Id*. (citing *Lockheed Martin Corp. v. Network Solutions, Inc.,* 985 F. Supp. 949, 962 (C.D. Cal. 1997) ("While the landlord of a flea market might reasonably be expected to monitor the merchandise sold on his premises, NSI cannot reasonably be expected to monitor the Internet.")).[14]

Similarly, Defendants have no control over the infringing actions of the merchants.  No product or service of any Defendant is allegedly used in or part of any infringing act, as is required by *Inwood* and *Lockheed*.  There is no allegation in the Complaint that any Defendant can control the content of any website, or that any Defendant provides a service that is necessary for the infringement to take place.  Because the Complaint does not allege that Defendants have "induced" the infringement of the trademarks, or that Defendants have any control over the "instrumentality" used by the merchants to infringe the trademark, Perfect 10's trademark claims that rest upon a theory of contributory liability must be dismissed.

---

[13] In *Fonovisa*, the Ninth Circuit held that the defendant flea market operator might be liable if it "suppl[ied] the necessary marketplace for" the sale of infringing music recordings.  *Id*. at 265.  Perfect 10's allegations do not meet this test either, because, again, Defendants are not "internet landlords" and do not supply the "site and facilities"; they do *not* supply either products or the "necessary marketplace" for any infringing merchant to display their infringing goods.

[14] Indeed, at the time NSI registered the infringing domain name in *Lockheed*, it was the *only* source for domain names.  Here, Defendants' role is hardly essential as there are numerous payment alternatives.  Perfect 10's Complaint makes this point, as it admits its own website has continued to exist without Visa bank card processing services since 2001.  Complaint, ¶¶ 39, 72.  If termination by Defendants could possibly constitute "direct control," surely the Perfect 10 properties would have been shut down, but they are not.

2.      **Perfect 10 cannot allege the necessary partnership with or control over any merchant needed to support a claim for vicarious trademark infringement.**

As noted above, vicarious liability under trademark law requires *greater* involvement with a direct infringer than that required by copyright law. *Sony Corp., supra,* 464 U.S. at 439 n.19 (citing "fundamental differences" between copyright and trademark law); *Hard Rock Cafe,* 955 F.2d at 1150 (explaining that vicarious liability requires "a finding that the defendant and the infringer have an apparent or actual partnership, have authority to bind one another in transactions with third parties or exercise joint ownership or control over the infringing product.").

The Seventh Circuit in *Hard Rock* held that a swap meet operator, being a land owner as opposed to a contract service provider, might have a duty to control known infringement (contributory liability), but could not be vicariously liable for unknown infringement because the required partnership or joint control or ownership over the infringing product was missing. *Id*. at 1148-50.  The Ninth Circuit has adopted and followed *Hard Rock* in limiting liability for contributory trademark infringement to landlords but not expanding it to services providers. *See Lockheed Martin,* 194 F.3d at 984-85.

As with the vicarious liability copyright claim, Perfect 10 has not alleged, and cannot allege, facts demonstrating any Defendant's partnership with any merchant or their joint control or ownership of any website infringing Plaintiff's trademarks.  There are no allegations that any Defendant has a sufficiently direct relationship with any individual merchants resulting in control over the merchants' acts.  Perfect 10 simply offers the inadequate conclusion that "Defendants had the right and ability to supervise and/or control the infringing content that exists on the Stolen Content Websites." Complaint, ¶ 98.[15]  But Perfect 10 has not alleged *facts* that support the conclusion.  Since, as Perfect 10 admits, Defendants merely provide "back-end" services, the requisite partnership and control *cannot* exist.  Complaint, ¶¶ 8-9, 46-48.  Thus, as with the copyright claim, the facts as alleged do not support a claim for vicarious trademark infringement.

---

[15] Again, Perfect 10's conclusory allegations need not be accepted.  *See* Fn. 9 above.

1    In sum, Perfect 10's various trademark claims based solely on theories of vicarious liability must

2    be dismissed.

3    **C.      Perfect 10 Has Failed To Allege Facts Sufficient To State A Claim For Defendants'
         Vicarious Liability For Violation Of Publicity Rights**

4

5            In its Fifth Claim for Relief for alleged violation of the right of publicity,[16] Perfect 10

6    alleges no facts supporting a claim that any Defendant violated any rights of publicity owned by

7    Perfect 10.  The best Perfect 10 can allege is the following:

8            117.    Defendants knowingly support Stolen Content Websites which violate
                 Plaintiff's rights of publicity by appropriating likenesses belonging to
9                 Perfect 10 and by publishing the same on the Internet.

10           . . .

11           121.    Defendants are liable for aiding and abetting the infringement, and/or have
                 vicarious liability, as alleged above.
12

13           . . .

14           123.    Defendants' critical support of Stolen Content Websites that infringe
                 Perfect 10's rights of publicity has damaged, and will damage, Perfect 10
                 irreparably. . .
15

16   Complaint, ¶¶ 117, 121, and 123.  As with Perfect 10's other conclusory allegations of

17   Defendants' "critical support," the only factual substance alleged is that Defendants provided

18   transaction processing services to cardholders and merchants.  Complaint, ¶ 22.

19           Critically, Perfect 10 does *not* allege that Defendants themselves committed, participated

20   in, or provided substantial assistance or encouragement to the alleged infringement of any rights

21   of publicity.  Perfect 10 does not allege that Defendants have done anything other than what they

22   do for the world at large, namely process financial transactions involving merchants and

23   consumers.  Instead, Perfect 10 alleges that Defendants should be liable for not preventing

24   violations of the right of publicity.  Perfect 10 apparently singles Defendants out among all the

25   _____

26   [16] A cause of action for right of publicity derives from both the common law and the California
     Civil Code § 3344.  The elements of the common law tort of appropriation of an individual's
27   name or likeness are:  (1) the defendant's use of the plaintiff's identity; (2) the appropriation of
     plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of
28   consent; and (4) resulting injury.  *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400,
     409 (2001).

22

330585.01

1    vendors in the world that enable the accused third parties to exist and to operate their businesses.

2    Perfect 10 attempts to sweep Defendants into other parties' liability by alleging (without facts)

3    the legal conclusions that Defendants have "conspired with" or have "aided and abetted" those

4    third parties.[17]  Such conclusions can and should be ignored.

5    **D.**      **Defendants Cannot Be Liable For Violation Of Sections 17200 And 17500 Of The California Business & Professions Code.**

6

7          **1.**      *Emery* **establishes that Defendants cannot be liable under Business and Professions Code §§ 17200 or 17500 for the conduct of others.**

8         *Emery* is highly persuasive authority with respect to Perfect 10's federal law claims.  But

9    *Emery* is dispositive and binding on Perfect 10's California law claims, especially Perfect 10's

10    §§ 17200 and 17500 claims (Perfect 10's Sixth and Seventh Claims for Relief).  Defendant bank

11    card transaction processing networks have no duty to police the millions of unaffiliated

12    merchants authorized to accept Visa and MasterCard payment cards in connection with

13    infringements of the sort Perfect 10 alleges.

14         As discussed above, *Emery* involved third-party merchants illegally marketing foreign

15    lotteries to California consumers and using the Visa payment system to complete the

16    transactions.  Visa was sued under a contributory theory of liability for unfair competition by a

17    private attorney general, on behalf of consumers in California who purchased the illegally

18    marketed foreign lottery tickets.  The trial court granted summary judgment to Visa, and the

19    California Court of Appeal affirmed.  Visa did not exercise the requisite control over the

20

21    [17] Plaintiff conclusorily alleges that, by not affirmatively policing independent web businesses

22    after receiving Perfect 10's notices of alleged infringements, Defendants are "aiding and abetting" the websites' unlawful conduct. *See, e.g.,* Complaint, ¶¶ 22, 28.  But adding such

23    conclusory labels cannot change Defendants' clear lack of duty.  As the court made clear in *Emery*, neither Visa or MasterCard nor any other independent provider of lawful services or

24    products, can be liable for "aiding and abetting" its customers' unlawful conduct merely by continuing to supply legal services and products, even after receiving notice that its customer is

25    engaged in alleged unlawful activity.  "Knowledge of, or failure to prevent, a crime is not sufficient to establish aiding and abetting liability." *Emery*, 95 Cal. App. 4th at 962-63 (citing

26    *People v. Durham*, 70 Cal. 2d 171, 181 (1969); *see also Sony Corp.*, 464 U.S. at 442 (no liability under Copyright Act in selling machine that has substantial non-infringing uses); *Hard Rock*

27    *Café,* 955 F.2d at 1148 (independent temporary help from service provider to known infringer has no duty); *People v. Brophy*, 49 Cal. App. 2d 15, 29-32 (1942) (services provision contract

28    "legal in itself" not rendered unenforceable even if provider knows recipient intends to violate law).

330585.01

1    merchant—either directly or through an agency relationship—to find secondary liability for false

2    advertising or unfair business practices.  *Emery*, 95 Cal. App. 4th at 959-64.

3          The *Emery* court's explanation in that case applies equally to Perfect 10 here:

4          We need go no further than to remind plaintiff that his *unfair practices claim*
           *under section 17200 cannot be predicated on vicarious liability*.  "The concept of
5          vicarious liability has no application to actions brought under the unfair business
           practices act."  A defendant's liability must be based on his personal
6          "participation in the unlawful practices" and "unbridled control" over the
           practices that are found to violate sections 17200 or 17500.  Unlike Mr. Toomey,
7          *VISA exercised no control over the preparation or distribution of the solicitations,*
           *nor did it have any relationship with the merchants who did.*

8

9    95 Cal. App. 4th at 960 (emphasis added) (citations omitted).

10         Defendants' networks, operations and indirect relationships with merchants have not

11   changed one whit in the two years since *Emery* was decided.  Now, as then, Visa—and the other

12   Defendants—"exercise no control over the preparation or distribution of [unlawful website

13   graphics]."  Since Perfect 10 has not alleged and cannot allege any facts meaningfully different

14   from the *Emery* facts, its claims must be dismissed.

15         The court in *Emery* held that payment processing and financial service-related providers

16   such as Defendants cannot be liable for false and misleading advertising or unfair business

17   practices under §§ 17200 and 17500, based on the conduct of unrelated merchants.  The Court's

18   rationale and holding, founded squarely on state common law theories of tort responsibility,

19   apply equally to all of the state tort-law claims asserted by Perfect 10.

20         **2.    To the extent Perfect 10 asserts claims based on copyright infringement,
                   these state law claims are preempted.**

21

22         Perfect 10 includes in its unfair competition claim assertions that unequivocally concern

23   copyright infringement.  Perfect 10 alleges:

24         127.   Defendants have provided critical support to Stolen Content Websites that
                  offer a vast library of misappropriated content . . . .  This misappropriated
25                content includes (but is not limited to) material that infringes upon the
                  rights of Perfect 10 and third-party publishers, film owners, celebrities and
26                models . . . .

27         128.   Defendants are also providing critical support to webmasters that are
                  engaged in other clearly illegal activity such as selling access to
28                unauthorized passwords  [to websites] . . . leading to massive infringement

24

330585.01

of Perfect 10's copyrights . . . [and to] websites that appear to offer the illegal downloading of hundreds of millions of songs and/or movie clips . . . .

Complaint ¶¶ 127, 128.

There can be no question that alleged copyright infringements are a central focus of Perfect 10's state-law unfair competition claims.  Long-established case law is clear, however, that such a claim is preempted by the Copyright Act, 17 U.S.C. §301.  *See Kodadek v. MTV Networks, Inc.,* 152 F.3d 1209, 1212-13 (9th Cir. 1998); *Cybernet Ventures,* 167 F. Supp. 2d at 1125.  Perfect 10's unfair competition claims based upon copyright subject matter must be dismissed as a result.

### 3.    The state-law unfair competition claims are congruent with Lanham Act claims and must fall with the Lanham Act claims.

Perfect 10's state-law unfair competition claims assert liability of Defendants for allegedly supporting other parties who act improperly "by misrepresenting the source or sponsorship of material on their websites, by palming off the property of Perfect 10 and third parties as their own," (Complaint, ¶ 127) and by various other misrepresentations.  Claims for allegations of trademark infringement, passing off, and unfair competition under state unfair competition laws are considered "congruent" with the analogous Lanham Act trademark and unfair competition claims and must fall together with the Lanham Act claims.  *See Denbicare U.S.A. Inc. v. Toys "R" Us, Inc.,* 84 F. 3d 1143, 1152-53 (9th Cir. 1996).

### V.    PERFECT 10'S LIBEL CLAIM MUST BE DISMISSED BECAUSE IT HAS NOT ALLEGED, AND CANNOT ALLEGE, FACTS SUFFICIENT TO STATE A CLAIM FOR LIBEL.

As described above, Perfect 10 has alleged that MasterCard and Visa rules require that banks terminate merchants with excessive chargebacks and that merchants whose accounts are terminated be placed into the Combined Terminated Merchant File ("CTMF").  Complaint, ¶ 11, 12.  Perfect 10 alleges that it was libelous for Defendants to put it in the CTMF even though it concedes that it was terminated for excessive chargebacks.

Perfect 10's libel cause of action should be dismissed because:  (1) it is time-barred; (2) the allegedly libelous statements were true; and (3) the allegedly libelous statements are

25

1    privileged and not actionable.  Furthermore, the allegedly libelous statements do not constitute

2    libel *per se* and Perfect 10 has not pleaded special damages with particularity as required by Rule

3    9 of the Federal Rules of Civil Procedure.

4    **A.    Perfect 10's Libel Claim Is Time-Barred by the One-Year Statute of Limitations.**

5        Under California law, a libel action must be commenced within one year after the

6    aggrieved party discovered the publication of the allegedly libelous statement.  *See* Cal. Civ.

7    Proc. Code § 340(c).  Perfect 10 claims that it was libelous for Defendants to put Perfect 10 in

8    the CTMF.  *See* Complaint, ¶¶ 143-47.  Perfect 10 alleges, however, that it was placed on the

9    CTMF "in or about Spring 2001."  Complaint, ¶ 144.  Perfect 10 filed this Complaint in January

10   2004—nearly three years after the allegedly libelous statement were made.  Therefore, Perfect

11   10's libel claim must be dismissed because it did not commence the action within one year of the

12   publication of the alleged libel.[18]

13   **B.    Perfect 10's Libel Claim Must Be Dismissed because the Allegedly Libelous
         Statements Were True.**
14

15       Libel is "a false and unprivileged publication by writing, picture, effigy, or other fixed

16   representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or

17   which causes him to be shunned or avoided, or which has a tendency to injure him in his

18   occupation."  Cal. Civ. Code § 45.  Truth is a complete defense to a libel claim, regardless of bad

19   faith or malicious purpose.  *See Francis v. Dun & Bradstreet*, 3 Cal. App. 4th 535, 540 (1992)

20   (finding that a true but harmful credit report is not defamatory as a matter of law).  It is axiomatic

21   that the truth or falsity of a statement is measured as of the time of its publication.

22       Aside from Perfect 10's repeated conclusory misinterpretations of the CTMF, the

23   Complaint ultimately recognizes the CTMF for what it is:  a list of "terminated merchants."

24

---

25   [18] Perfect 10 may attempt to argue that the alleged libel has been republished within the statutory
     period.  Such an argument will fail.  *First*, the Complaint alleges only one publication of a
     libelous statement.  *See* Complaint, ¶ 147 ("As a proximate result of *the* publication alleged in
26   the preceding paragraphs, plaintiff has lost customers and revenues.").  *Second*, the Complaint
     correctly alleges that defendants do not *publish* the CTMF list as required for a libel claim.  *See*
27   Complaint, ¶ 12.  Rather, the CTMF is a file to which certain businesses have "access."  *Id*.
     Label is "a false *publication*" of defamatory material.  Cal. Civ. Code § 45 (emphasis added).
28   Accessing a file is not republication of a defamatory statement for statute of limitations purposes.

ALL DEFENDANTS' CONSOLIDATED MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS   CASE NO. C 04 0371 JW (PVT)

1    Complaint, ¶ 12.  Consequently, inclusion on the CTMF constitutes nothing more than a

2    statement that a merchant had in fact been terminated.  Perfect 10 admits that it *was* in fact

3    terminated as a merchant.  *See* Complaint, ¶ 28.  Defendants cannot be liable for libel for a true

4    statement.  Accordingly, the libel claim must be dismissed.

5            Even if this Court accepted Perfect 10's conclusory interpretation of the *nature* of the

6    statements made by its inclusion on the CTMF, Perfect 10 has not pleaded *facts* that establish

7    that its inclusion on the CTMF constituted a false statement.  To the contrary, Perfect 10

8    concedes in the *facts* pled (rather than *conclusions* alleged) that the reasons it was put in the

9    CTMF are true.  Perfect 10 makes conclusory allegations that its inclusion in the CTMF is

10   libelous because it constitutes a declaration to the payment card industry that:  1) it is guilty of

11   imposing improper charges and/or wrongful conduct, and 2) it presents a significantly higher

12   than usual risk of loss to a payment card processing service provider.  *See* Complaint, ¶ 144.  But

13   the facts alleged elsewhere in the Complaint demonstrate that Perfect 10 was terminated and

14   placed in the CTMF because of excessive chargebacks—facts that Perfect 10 concedes are true.

15   Specifically, Perfect 10 alleges that (1) "Visa and MasterCard require member banks to terminate

16   the accounts of merchants whose 'chargeback' ratios exceed allowable limits" (Complaint, ¶ 11);

17   (2) terminated merchants must be placed in the CTMF (Complaint, Ex. 2 (bank must "ensure that

18   terminated [merchants] . . . are added to the CTMF")); and (3) Defendants terminated Perfect 10

19   "for high chargeback rates" (Complaint, ¶ 28).  Most importantly, Perfect 10 concedes that at the

20   time it was terminated *it was in fact running excessive chargeback rates*.  *See* Complaint, ¶ 28.

21   Perfect 10 claims that "subsequent[]" to its termination it was in compliance "from that point

22   forward" with rules regarding chargebacks, conceding that it was not in compliance at the time

23   that it was terminated and put into the CMTF.  Complaint, ¶ 28.  At the time Perfect 10 was

24   placed in the CMTF it presented a higher than usual risk of loss to a payment card processing

25   service provider because of its excessive chargebacks.  Therefore, the allegedly libelous

26   statements are true.  Perfect 10's libel claim must be dismissed.

27

28

**C.    Perfect 10's Libel Claim Must Be Dismissed because the Allegedly Libelous Statements Are Privileged.**

Perfect 10's libel claim must be dismissed for a third, independent reason:  the allegedly libelous statement is protected by California's "common interest privilege," which immunizes from liability in tort a person's statement to others on matters of common interest, provided that the person did not act with malice.  Cal. Civ. Code § 47(c); *see also Coastal Abstract Service, Inc. v. First American Title Ins. Co.* 173 F.3d 725, 735 (9th Cir. 1999).  A statement can be libelous only if it is "unprivileged."  Cal. Civ. Code § 45.  Privileged publications include communications made "without malice, to a person interested therein, (1) by one who is also interested, . . . or (3) who is requested by the person interested to give the information."  Cal. Civ. Code § 47(c).  Existence of the privilege is a question of law for the Court to decide.  *See Coastal Abstract Service*, 173 F.3d at 735.

California courts have applied the common interest privilege in a broad variety of circumstances analogous to those alleged by Perfect 10, including: statements by a seller to a performance bondholder regarding a buyer's ability to pay,[19] statements by an employee to a company president regarding another employee's behavior,[20] the listing of a retailer as "financially embarrassed or insolvent" by a board of trade association, resulting in members ceasing to extend credit to the retailer,[21] and statements of an appraiser of property to a bank regarding incompetency of property managers.[22]

In *Pavlovsky v. Board of Trade*, the California Court of Appeal applied the common interest privilege to immunize allegedly libelous statements similar to those at issue in this case.[23]  In *Pavlovsky*, the defendant was an association composed of 350 companies that published for use by its members a list of retailers reported as being "financially embarrassed or

---

[19] *Gantry Constr. Co., Inc. v. American Pipe and Constr. Co.*, 49 Cal. App. 3d 186 (1975).

[20] *Vackar v. Package Mach. Co.*, 841 F. Supp. 310 (N.D. Cal. 1993).

[21] *Pavlovsky v. Board of Trade*, 171 Cal. App. 2d 110 (1959).

[22] *Cabanas v. Gloodt Associates*, 942 F. Supp. 1295 (E.D. Cal. 1996).

[23] *Pavlovsky v. Board of Trade*, 171 Cal. App. 2d 110 (1959).

28

ALL DEFENDANTS' CONSOLIDATED MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS   CASE NO. C 04 0371 JW (PVT)

330585.01

1  insolvent" by members, a designation which caused the other members to cease to deal with such

2  retailers on a credit basis.  The complaint alleged that the plaintiff was incorrectly placed on the

3  list, giving rise to a libel claim.  The court held that it was implicit in the complaint that the

4  association and its members were "interested" in the insolvent retailer list and thus the privilege

5  in Section 47(c) applied.  *See Pavlovsky*, 171 Cal. App. 2d at 113.

6        Here, as in *Pavlovsky*, Perfect 10 alleges the quintessential interested statement:  a

7  communication among association members concerning the financial risk associated with a

8  potential merchant.  Complaint, ¶ 144.  Perfect 10 alleges that Defendants Visa and MasterCard

9  are associations of members that maintain a list of merchants that have been terminated.

10  Complaint, ¶¶ 8, 12.  Perfect 10 further alleges that placement in the CTMF is a declaration to

11  the payment card industry concerning Perfect 10's credit-worthiness and that only member banks

12  and third party processors have access to the file.  *See* Complaint, ¶¶ 12, 144.  Thus, Defendants

13  are "interested" in the CTMF under Civil Code section 47(c), and the placement of Perfect 10 on

14  the CTMF was a privileged communication.  Therefore, unless Defendant's placement of

15  Perfect 10 on the CTMF was malicious, the libel claim must be dismissed.  *See* Cal. Civ. Code

16  § 47(c).

17        Perfect 10 has not alleged facts showing that Defendants acted with actual malice.

18  Malice is "that state of mind arising from hatred or ill will toward the plaintiff."  Cal. Civ. Code

19  § 48a(4)(d).  "[T]he pleading of malice must set forth specific acts."  *Noonan v. Rousselot*, 239

20  Cal. App. 2d 447, 454 (1966).  Conclusory allegations do not suffice.  See *id*. (allegation that

21  Defendants acted "wickedly and maliciously" merely a conclusion).  *See also Howard v.*

22  *America Online Inc*., 208 F.3d 741, 750 (9th Cir. 2000) ("Conclusory allegations are insufficient

23  to preclude dismissal" and are ignored in considering Rule 12(b)(6) motion to dismiss).

24        Perfect 10 has not alleged any specific acts in the Complaint from which it can be

25  inferred that any of the Defendants acted with hatred or ill will toward Perfect 10.  Perfect 10

26  mentions malice only once:  it makes the conclusory allegation in paragraph 148 of the

27  Complaint that Defendants' conduct was "willful, oppressive, fraudulent, and malicious."

28

1    Conclusory allegations of malice cannot support a libel claim.  Therefore, the allegedly libelous

2    statement is privileged and Perfect 10's libel claim must be dismissed.

3    **D.      Perfect 10 Has Not Alleged Special Damages.**

4          "Defamatory language not libelous on its face is not actionable unless the plaintiff alleges

5    and proves that he has suffered special damages as a proximate result thereof."  Cal. Civ. Code

6    § 45a.  A statement is libelous "on its face" if the defamatory character is apparent without

7    reference to any further explanation or surrounding circumstances.[24]  Special damages are all

8    damages plaintiff suffered in respect to his property, business, trade, profession or occupation,

9    including such amounts of money as plaintiff alleges he has expended as a result of the alleged

10   libel.  *See* Cal. Civ. Code § 48a(4)(b).  When items of special damage are claimed, they must be

11   pleaded precisely.  Fed. R. Civ. P. 9(g); *Gomes v. Fried*, 136 Cal. App. 3d 924, 939-40 (1982).

12         Perfect 10's Complaint attempts to characterize the allegedly libelous statement as libel

13   "on its face."  Complaint, ¶ 144.  This attempt fails, however, because the meaning it seeks to

14   infer from its inclusion on the CTMF cannot be understood without explanatory matter.  At the

15   very least, one examining the CTMF would need a copy of Visa's and MasterCard's rules to

16   determine under what circumstances a merchant is listed on the CTMF.  Consequently,

17   placement on the CTMF is not libel *per se* and Perfect 10 must plead special damages with

18   particularity.

19         Perfect 10 has failed to do so.  Perfect 10 has broadly alleged that it has been prevented

20   from obtaining bank card charge processing services, in turn preventing it from obtaining the

21   business of and revenues from customers who are payment cardholders.  *See* Complaint, ¶¶ 146-

22   47.  Perfect 10 has not identified any such customers, the number of such customers or the

23   amount of revenue loss suffered as required.  As a result, Perfect 10 has failed to meet its burden

24   to plead special damages with particularity.

25

---

26   [24] *Palm Springs Tennis Club v. Rangel,* 73 Cal. App. 4th 1, 5 (1999) ("If [a] defamatory meaning
     would appear only to readers who might be able to recognize it through some knowledge of
27   specific facts and/or circumstances, not discernible from the face of the publication, and which
     are not matters of common knowledge rationally attributable to all reasonable persons, then the
28   libel cannot be libel per se but will be libel per quod.").

ALL DEFENDANTS' CONSOLIDATED MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS   CASE NO. C 04 0371 JW (PVT)

## VI.   PERFECT 10'S CLAIM FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE MUST BE DISMISSED.

As with its libel claim, Perfect 10 bases its interference with prospective economic advantage claim on Defendants' placement of Perfect 10 in the CTMF.  Perfect 10's intentional interference in prospective economic advantage cause of action must be dismissed because: (1) it is time-barred; (2) Perfect 10 fails to allege a probability of future economic benefit from existing economic relationships; and (3) Perfect 10 fails to allege an independently wrongful act.[25]

### A.   Perfect 10's Claim is Time-Barred by the Two-Year Statute of Limitations.

California courts have uniformly held that the two-year statute of limitations established by California Code of Civil Procedure section 339 applies to intentional interference with prospective economic advantage claims.  *See Tu-Vu Drive-In Corp. v. Davies*, 66 Cal. 2d 435, 437 (1967); *Knoell v. Pertovich*, 76 Cal. App. 4th 164, 168 (1999).  Perfect 10 alleges that Defendants interfered with its prospective economic advantage when they put Perfect 10 in the CTMF "in or about Spring 2001."  Complaint, ¶¶ 143, 154.  This Complaint was filed in January 2004, almost three years later.   Therefore, Perfect 10's interference claim is barred by the statute of limitations and must be dismissed.

### B.   Perfect 10 Has Failed to Allege a Probability of Future Economic Benefit from Existing Economic Relationships.

Even were Perfect 10's interference claim not time-barred, its claim should be dismissed for another reason:  Perfect 10 has pled the antithesis of an interference claim.  Perfect 10 alleges that Defendants chose not to continue to do business with it and terminated Perfect 10's status as

---

[25] In order to successfully plead the tort of intentional interference with prospective economic advantage, plaintiff must allege:  (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit or advantage to the plaintiff; (2) defendant knew of the existence of that relationship; (3) defendant intentionally engaged in wrongful conduct designed to interfere with or disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the wrongful conduct of the defendant.  *JRS Products, Inc. v. Matsushita Elec. Corp. of America*, 115 Cal. App. 4th 168, 179-80 (2004).  Furthermore, plaintiff must plead that the defendant "engaged in conduct that was wrongful by some legal measure other than the fact of the interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 393 (1995).

31

330585.01

1    an approved merchant.  Perfect 10 thus fails to allege any ongoing economic relationships with

2    anybody—customers, member banks or ISOs—that would provide the requisite expectancy in

3    future economic benefits.  "[A]n essential element of the tort of intentional interference with

4    prospective business advantage is the existence of a business relationship with which the

5    tortfeasor interfered.  Although this need not be a contractual relationship, an existing

6    relationship is required."  *Roth v. Rhodes*, 25 Cal. App. 4th 530, 546 (1994) (citations omitted).

7            Perfect 10 does not allege it had an existing economic relationship with any member bank

8    or ISO; rather, Perfect 10 merely alleges that it had "*potential* economic relationships" with

9    member banks and ISO's.  Complaint, ¶ 153 (emphasis added).  An allegation of "potential"

10   economic relationships is not adequate.  The tort "protects the expectation that the [specified]

11   relationship eventually will yield the desired benefit, not necessarily the more speculative

12   expectation that a potentially beneficial relationship will eventually arise."  *Westside Ctr. Assoc.*

13   *v. Safeway Stores 23, Inc.,* 42 Cal. App. 4th 507, 522 (1996) (precluding application of the tort to

14   future "hypothetical relationships" with all possible buyers not developed at the time of the

15   allegedly tortious acts); *see also Blank v. Kirwan*, 39 Cal. 3d 311, 331 (1985) (plaintiff had no

16   protectable expectancy of a relation with the class of potential poker club patrons "but at most a

17   hope for an economic relationship and a desire for future benefit"); *Roth*, 25 Cal. App. 4th at 546

18   (podiatrist denied space in medical building did not have existing relationships with "speculative

19   future patients").

20           Furthermore, "the law precludes recovery for overly speculative expectancies by initially

21   requiring proof that the business relationship contained 'the *probability* of future economic

22   benefit to the plaintiff.'"  *Westside Ctr. Assoc.*, 42 Cal. App. 4th at 522 (quoting *Youst v. Longo*,

23   43 Cal. 3d 64, 71 (1987) (emphasis in original).  "[I]t must be reasonably probable that the

24   prospective economic advantage would have been realized but for defendant's interference."

25   *Youst*, 43 Cal. 3d at 71 (sustaining demurrer because plaintiff could not establish probability that

26   racehorse would have won a larger prize absent intentional interference by competitor).

27           Perfect 10 offers only the conclusory allegation that including Perfect 10 in the CTMF

28   has resulted in "injury to its business, trade, profession, and occupation" (Complaint, ¶ 154) and,

32

330585.01

1    as a result, Perfect 10 "has not been able to process Visa cards directly" (Complaint, ¶ 28) and

2    "has incurred significantly higher costs by its inability to have its own merchant account."

3    Complaint, ¶ 28.  However, nowhere in the Complaint does Perfect 10 allege a reasonable

4    probability that it would realize a future economic benefit from its economic relationships and

5    transactions with customers, member banks or ISOs.  Nor has Perfect 10 alleged any facts giving

6    rise to an inference of such a probability.  For these reasons as well, the claim must be dismissed.

7    **C.    Perfect 10 Has Failed to Allege an Independently Wrongful Act.**

8          "[A] plaintiff seeking to recover for an alleged interference with prospective contractual

9    or economic relations must plead and prove as part of its case-in-chief that the defendant not

10   only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was

11   wrongful by some legal measure other than the fact of interference itself."  *Della Penna,* 11 Cal.

12   4th at 393.  An act is independently wrongful only if it is unlawful pursuant to some

13   "constitutional, statutory, regulatory, common law, or other determinable legal standard."

14   *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003).  Therefore, as a

15   matter of law, simply refusing to conduct business with a customer cannot amount to

16   interference with a prospective economic advantage.  *See Lange v. TIG Ins. Co.*, 68 Cal. App. 4th

17   1179, 1187 (1998) (exercise of contractual right of termination did not constitute an

18   independently wrongful act).

19         Perfect 10's only allegation of interference is based upon "defendant's wrongful

20   placement of plaintiff on the CTMF".  Complaint, ¶ 154.  As set forth above, however, there

21   was nothing wrongful about that listing:  Perfect 10 acknowledges that the CTMF was simply a

22   list of "terminated merchants"  (Complaint, ¶ 12) and alleges that, according to Visa Regulations,

23   a bank must "[e]nsure that terminated Sponsored Merchants and terminated IPSPs are added to

24   the Terminated Merchant File."   Complaint, Ex. 2 at 3.  Furthermore, Perfect 10 alleges that

25   "Visa and MasterCard require member banks to terminate the accounts of merchants whose

26   chargeback ratios exceed allowable limits"  (Complaint, ¶ 11) and that its account was

27   terminated for "high chargebacks".  Complaint, ¶ 28.  Because Perfect 10 does not—and

28

33

330585.01

1   cannot—allege that it was in compliance with chargeback ratio rules at the time it was placed on

2   the CTMF, there is no allegation of wrongful activity that can support a claim of interference.[26]

3          Perfect 10 has not pleaded and cannot plead that Defendants engaged in any conduct that

4   was wrongful by some legal standard other than the fact of the interference itself.  Therefore, this

5   claim for intentional interference with prospective economic advantage must be dismissed in its

6   entirety.

7                                    **VII.   CONCLUSION**

8          Perfect 10 has alleged a laundry list of claims in this action, all of which can be boiled

9   down to a single premise:  that it can somehow create a duty on the part of Defendants (or

10  apparently anyone else) to undertake the burden of policing Perfect 10's rights against third-

11  party infringers by the simple expedient of demanding that Defendants do so.  No such free-

12  floating "duty by tag" exists under any of the legal doctrines asserted by Perfect 10, or any other

13  doctrine.  This is not a mere failure to allege the right facts, and it is not a failure that can be

14  cured by more artful pleading.  Rather, it is a fundamental misunderstanding of the law, which—

15  if accepted by this Court—would erase entirely the line between tortfeasors and the rest of the

16  world.  Perfect 10 may well have a legitimate complaint with some website operators who have

17  misappropriated its property (although Perfect 10 has failed to allege even that complaint with

18  any coherence).  But that complaint is with those absent third parties, and Perfect 10's remedy is

19  //

20  //

21  //

22

23

24

25

---

26  [26] Perfect 10 also alleges that it has been injured under this claim as a result of "defendant's
27  participation in the business of the Stolen Content Websites".  Complaint, ¶ 154.  However,
    Perfect 10 has not pled that participation by the Defendants in the business of the allegedly
28  "Stolen Content Websites" is unlawful.  *See* discussion in Sections III-IV, *supra*.  Thus, it is not
    an independently wrongful act that can support a claim for interference.

34

1   to sue them, not Defendants.  Perfect 10 cannot appoint Defendants proxy for those alleged

2   infringers, simply because it is more convenient to sue them.  Accordingly, this Court should

3   dismiss each of Perfect 10's claims with prejudice.

4

5   Dated:  April 19, 2004                                    KEKER & VAN NEST, LLP

6

7

                                                    By:  _____/s/  Michael H. Page_____
8                                                        ROBERT A. VAN NEST
                                                         MICHAEL H. PAGE
9                                                        R. JAMES SLAUGHTER
                                                         Attorneys for Defendants
10                                                       FIRST DATA CORP., CARDSERVICE
                                                         INTERNATIONAL, INC., and
11                                                       HUMBOLDT BANK

12

13  Dated:  April 19, 2004                                    TOWNSEND AND TOWNSEND AND
                                                         CREW LLP
14

15

16                                                  By:  _____/s/  Mark T. Jansen_____
                                                         DANIEL J. FURNISS
17                                                       MARK T. JANSEN
                                                         JOHN C. BAUM
18                                                       Attorneys for Defendant
                                                         VISA INTERNATIONAL SERVICE
19                                                       ASSOCIATION

20

21  Dated:  April 19, 2004                                    WINSTON & STRAWN LLP

22

23

24                                                  By:  _____/s/  Andrew P. Bridges_____
                                                         ANDREW P. BRIDGES
25                                                       Attorneys for Defendant
                                                         MASTERCARD INTERNATIONAL
26                                                       INCORPORATED

27

28

ALL DEFENDANTS' CONSOLIDATED MEMO. OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS   CASE NO. C 04 0371 JW (PVT)