KING, HOLMES, PATERNO & BERLINER LLP
HOWARD E. KING, ESQ., STATE BAR NO. 077012
STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
1900 AVENUE OF THE STARS, 25TH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
E-MAIL:    ROTHSCHILD@KHPBLAW.COM
TELEPHONE: (310) 282-8989
FACSIMILE:  (310) 282-8903

JEFFREY N. MAUSNER (State Bar No. 122385)
JOHN R. YATES (State Bar No. 120344)
BERMAN, MAUSNER & RESSER
11601 Wilshire Boulevard, Suite 600
Los Angeles, California 90025-1742
E-MAIL:    JEFFMAUSNER@BMRLAW.COM
TELEPHONE: (310) 473-3333
FACSIMILE:  (310) 473-8303

DANIEL J. COOPER (State Bar No. 198460)
General Counsel, Perfect 10, Inc.
RANDY LEWIS (State Bar No. 210444)
Associate General Counsel, Perfect 10, Inc.

Attorneys for Plaintiff PERFECT 10, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| PERFECT 10, INC., a California corporation, | CASE NO. C 04-00371 JW (PVT) |
| Plaintiff, | Action Commenced:   January 28, 2004 |
| vs. | **PLAINTIFF'S OPPOSITION TO CONSOLIDATED MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES** |
| VISA INTERNATIONAL SERVICE ASSOCIATION; FIRST DATA CORP, a corporation; CARDSERVICE INTERNATIONAL, INC., a corporation; MASTERCARD INTERNATIONAL INCORPORATED, a corporation; HUMBOLDT BANK, a national banking association; and DOES 1 through 100, inclusive, | Date:    June 11, 2004 |
| | Time:    9:00 a.m. |
| | Ctrm:    8 |
| | Judge:   Honorable James Ware |
| Defendants. | |

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.     <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>**

3

   **A.     <u>Defendants' Relationship With The Stolen Content Websites</u>**

4
5
6
7
8
9
10
11
12

     This case is not about the straw horse defendants have tried to erect by pleading that they have no "duty to police the global economy."  Rather than seeking to impose liability on defendants for the conduct of every merchant that accepts Visa or MasterCard, this action is focused on a few hundred adult website merchants that defendants know are engaged in illegal activities.  This small group of websites, referred to by Perfect 10 as "Stolen Content Websites"— most of which are so-called "celebrity porn sites"—unfairly compete with Perfect 10 by misappropriating, selling and distributing Perfect 10 and third party content, and by engaging in a variety of other deceptive business practices, including spamming, fraudulent billing and false advertising.

13
14
15
16
17
18
19
20

     Defendants have actual and constructive knowledge that the Stolen Content Websites rely on illegal and fraudulent business practices.  Perfect 10 has provided defendants with written notice identifying specific Stolen Content Websites.  Copies of some of those notices are attached to the complaint as Exhibit "5."  In addition, defendants purport to regularly review and monitor these websites themselves, including in the regulations attached to the complaint as Exhibit "2."  Even after receiving notice of the illegality, defendants have continued to extend to these websites the privilege of membership in the charge card system that defendants control and to process their illegal transactions.

21
22
23
24

     Since acceptance of MasterCard and Visa is necessary to an Internet merchant's commercial viability, the illegal acts perpetrated by these merchants could not occur on the scale that they do–if at all–without defendants' substantial assistance.  Defendants continue to assist the Stolen Content Websites because of the significant profits defendants reap from them.

25
26
27
28

     Defendants' relationship with Stolen Content Website operators is nothing like the relationship between the electric company and the millions of customers it serves.  Knowing the special risks such webmasters pose, defendants have set up a special "High Risk Sponsored Merchant" class, of which Stolen Content Websites merchants are a part.  Unlike the electric

1   company, which administers its arms-length services indiscriminately to all, defendants predicate

2   the provision of their services to these merchants upon performing a comprehensive risk and

3   financial review of them, reviewing the content of their websites, and monitoring them on an

4   ongoing basis.  Moreover, in contrast to the electric company's content-neutral service, defendants

5   have adopted *content-specific* regulations specifically aimed at the Stolen Content Websites that

6   are the focus of this action.  Unfortunately, defendants have failed and refused to enforce those

7   regulations, and defendants' support of Stolen Content Websites has continued unabated.

8        At the same time that they continue supporting the Stolen Content Websites, defendants

9   have arbitrarily and maliciously prevented Perfect 10 from obtaining processing services from a

10  reputable source.  Defendants maintain an industry-wide "Black List."  Placement on the list

11  constitutes a declaration that a merchant is guilty of fraud, dishonesty, or other misconduct.

12  Merchants on the Black List are not allowed to obtain charge card transaction processing from

13  members of the Visa/MasterCard systems.  Defendants have Black Listed Perfect 10 and its

14  president, Dr. Zada, who has been a professor at UCLA and at Stanford and Columbia

15  Universities, even though defendants know that neither Perfect 10 nor its management is guilty of

16  any misconduct.  Plaintiff's inability to obtain charge card transaction processing from a reputable

17  source has caused it serious harm.  Among other things, it has left plaintiff even less able to

18  compete with the Stolen Content Websites that defendants support and that thrive on content they

19  have stolen from Perfect 10.

20       Defendants wield massive economic power.  In an increasingly "cashless" economy, as

21  online merchants proliferate, merchants who are denied the ability to process credit cards cannot

22  compete effectively with merchants to which defendants do give that ability.  However,

23  defendants' power should not immunize defendants from legal responsibility for the illegality in

24  which they knowingly participate.  Accordingly, this Court should deny the instant motion, in its

25  entirety.

26       B.   **Perfect 10 Has Alleged Facts Sufficient to State Each of the Claims in the**
              **Complaint**

27       As more fully set forth below, the allegations in the complaint are sufficient to sustain each

28

1   of Perfect 10's causes of action, as follows:

2        •    **Unfair Business Practices, Right of Publicity, and Contributory Copyright and**

3   **Trademark Infringement.**  The Stolen Content Websites could not exist without the

4   services defendants provide.  Defendants' processing of MasterCard and Visa transactions

5   for Stolen Content Websites, with knowledge that the websites are guilty of copyright and

6   trademark infringement, and other fraudulent and dishonest business practices that violate

7   California law, is sufficient to state a claim for unfair business practices and violation of

8   Perfect 10's right of publicity.  Furthermore, with regard to Perfect 10's claim for

9   contributory copyright and trademark infringement, defendants do far more than merely

10   provide the "site and facilities" for infringement.  Defendants' transaction processing

11   occurs at the point of sale and distribution and continues through payment and, therefore,

12   relates directly to the infringing activity.

13        •    **Vicarious Copyright Infringement.**  Defendants' contracts and regulations, along

14   with their vast economic power, give defendants an unfettered right and the actual ability

15   to control the Stolen Content Websites.  Beyond the legal right, Perfect 10's allegations are

16   also replete with facts supporting defendants' actual ability to control these websites.  First,

17   Stolen Content Website merchants, who number only in the hundreds, belong to a group

18   that defendants have specially designated as High Risk Sponsored Merchants, which, as

19   discussed above, are subject to defendants' tight control because of the unique business

20   risks they pose.

21        Second, although defendants have failed and refused to enforce the regulations they

22   have enacted for unauthorized "celebrity porn sites," requiring Perfect 10 to file this action,

23   the enactment of the regulations demonstrates defendants' right and ability to control the

24   Stolen Content Websites' illegal activities.

25        Defendants also derive a substantial financial benefit from the infringing activity.

26   First, in the case of the acquirers (i.e., defendants Humboldt, FDC and CardService),

27   defendants actually buy the charge for an infringing transaction from the Stolen Content

28   Website merchant, and then pay the proceeds to the merchant, less a high discount rate that

1    defendants retain for themselves.  Defendants also reap a direct financial benefit when

2    consumers challenge wrongful charges from the Stolen Content Websites, by levying fines

3    of as much as $100 per incident against the websites.  The Stolen Content Websites

4    responsible for stealing Perfect 10 images also typically engage in other fraudulent and

5    deceptive acts, so that their chargeback ratios are generally significantly higher than

6    MasterCard and Visa limits.

7    •          **Libel and Intentional Interference with Prospective Business Advantage.**

8    Placement of Perfect 10 on the Black List is a false statement that Perfect 10 has engaged

9    in fraudulent, dishonest or other wrongful misconduct.  Defendants have placed Perfect 10

10   on the Black List with actual and constructive knowledge that they had no basis to do so.

11   Such knowledge constitutes malice and precludes defendants from asserting that their

12   defamation was privileged.  Defendants keep the Black List a secret, allowing access only

13   to Association member banks and their ISOs.  Therefore, Perfect 10 did not learn of the

14   defamation until several months before filing the instant action, when defendants refused

15   to provide it with direct charge card processing services.  As a result of the libel and

16   defendants' other wrongful conduct, consumers who would otherwise subscribe to Perfect

17   10's magazine or join Perfect 10's website have not done so.

18   **II.     STATEMENT OF FACTS**

19   **A.     Perfect 10's Business**

20   Perfect 10 owns and operates Perfect 10 Magazine, Perfect10.com and other adult-oriented

21   media.  Perfect 10's most valuable asset is its copyrighted images.  Perfect 10 has invested

22   substantial resources, including money, time and creative talent, to create its copyrighted content.

23   (Complaint, ¶¶ 29, 40-41, 74-75; Ex. 8.)  Perfect 10's registered trademarks, including PERFECT

24   10 and PERFECT10.COM, have been in commerce since 1991 and are widely known.  (*Id.*, ¶¶ 42,

25   91-92; Ex. 9.)

26   **B.     The Stolen Content Websites**

27   Defendants' "High Risk Sponsored Merchant" Program, described in section E, below,

28   includes a subgroup consisting of several hundred Stolen Content Websites that are engaged in the

1   illegal activities at issue in this case.  Those illegal activities include, but are not limited to,

2   intentional infringement on the copyrights and marks of Perfect 10 and others, and theft of the

3   rights of publicity of Perfect 10 and others.[1]  (*Id.*, ¶¶ 6-7, 15, 16, 20.)

4        Stolen Content Websites also engage in deceptive practices, including charging consumer

5   credit cards without authorization; falsely stating that memberships are free; grossly misstating the

6   number of images they have; requiring consumers to uncheck a small box to avoid charges;

7   promising explicit images and videos of celebrities that do not exist; providing or falsely

8   promising rape, incest and/or bestiality images; spamming; tricking consumers into buying

9   memberships; and appearing to be multiple websites, in order to induce consumers to purchase

10  multiple memberships.  (*Id.*, ¶¶ 6, 20, 52, 67-68; Ex. 1.)  The Stolen Content Websites in this case

11  consist primarily of illegal "celebrity porn" websites.

12      **C.    Defendants' Business**

13       MasterCard and Visa (collectively, the "Associations") are joint venture associations of

14  member banks, including defendant Humboldt Bank ("Humboldt"), in the business of

15  administering their charge card networks.  Association members issue charge cards to consumers

16  and acquire charge card transactions from merchants.  The credit card business yields enormous

17  profits to the Associations and their members.  Member banks often conduct their business as

18  transaction acquirers in partnership with third party processors, called "Independent Service

19  Organizations" ("ISO").  Defendant First Data Corp. ("FDC") and its subsidiary and alter ego,

20  defendant CardService International, Inc. ("CardService") are ISOs through which Humboldt

21  acquires transactions for its merchant account holders  (*Id.*, ¶¶ 10-11, 35-36, 46.)

22      **D.    Defendants' Charge Card Transaction Processing for Stolen Content Websites
         and the Stolen Content Websites' Reliance on Defendants' Services**

23       As transaction "acquirers," Humboldt, FDC and CSI verify and process credit card charges

24  according to Association rules.  After a merchant, including a Stolen Content Website, presents a

25  transaction, the acquirer in turn presents the transaction to Visa or MasterCard. The bank that

26

27  [1] Some such websites openly flaunt their illegality, encouraging customers to "Load it now before
     the lawyers take it down!"  (Complaint, ¶ 21.)

28

issued the charge card then notifies Visa or MasterCard whether it authorizes the transaction.  Visa and MasterCard relay that information back to the acquirer.  If Visa or MasterCard transmit a transaction authorization, the merchant transmits a payment request to the financial institution that issued the charge card to the consumer.  The issuer then pays the acquirer.  The acquirer purchases the sales draft generated from the transaction from the merchant at a discount, crediting the merchant's account with the acquirer for the amount of the draft less the acquirer's discount and less a per transaction fee.  The Associations receive a fee on each and every charge on their branded cards.  The Associations also dictate fees acquiring banks must pay issuing banks.  (Id., ¶¶ 8-9, 11, 47-48.)  Since so many Stolen Content Website transactions are unauthorized or fraudulent, many become "charge backs," i.e., they are reversed after a consumer complains to the bank that issued his charge card that he did not authorize the charges.  (Id., ¶ 13.)

To compensate for the risk inherent in the Stolen Content Websites' business practices, defendants extract exorbitant fees from them.  The Stolen Content Websites are so profitable that defendants continue to service them even though their fraudulent practices cause them to incur charge back rates far exceeding the arbitrarily low chargeback limits that defendants' rules impose on legitimate Internet merchants.  That is because defendants also charge Stolen Content Websites much higher penalties for chargebacks than they charge more conventional merchants—as much as $100.00 per charge back.[2]  Although it is against their rules, Stolen Content Websites are so profitable that defendants have conspired to allow them to accept MasterCard and Visa despite these high chargeback ratios.  (Id., ¶¶ 13, 18, 26, 27, 50, 55; Ex. 5.)  Without the ability to accept credit card payments that defendants provide, the Stolen Content Websites would have no practical means of charging for their illegal services and could not do business.  (Id., ¶ 19.)

### E.    Defendants' Control and Supervision of the Stolen Content Websites, Including Through Visa's High Risk Sponsored Merchant Program

The Associations have tens of thousands of pages of operating regulations that control every aspect of the charge card system.  For purposes of this case, the most important of the

---

[2] Thus a consumer challenge to a typical $2.00 charge would yield a $100 "fine" payable to defendants—fifty times the transaction amount.

Associations' rules and regulations are those that apply specifically to a special class of merchants that defendants have dubbed "High Risk Sponsored Merchants.  Stolen Content Websites, consisting mostly of celebrity porn websites, are a subgroup of High Risk Sponsored Merchants.  (*Id.*, Ex. 2, pp. 6-8.)[3]

Visa has created the "High Risk" system in part so defendants can continue to profit from Stolen Content Websites while avoiding the appearance of a direct affiliation with them and minimizing the financial risk that their illegal activities create.  Under that system third parties that defendants control, called Internet Payment Service Providers, submit charges for payments on behalf of High Risk Sponsored Merchants.  (*Id.*)  In addition to the transaction processing fees and high discount rates, Visa charges "High Risk" merchants an extra $500 to join the program, plus membership dues of $250 per year.  (*Id.*, Ex. 2, p. 8.)

The special rules for High Risk Sponsored Merchants purport to require Association members to investigate and terminate such merchants of which the members or their ISOs have knowledge.  In addition, acquirers such as Humboldt, FDC and CardService are supposed to (i) perform a comprehensive risk and financial review of the High Risk Sponsored Merchants; (ii) provide ongoing reports on High Risk Sponsored Merchants activity on a monthly basis in an electronic format specified by Visa; and (iii) conduct reviews of the High Risk Sponsored Merchants' website.  (*Id.*, ¶¶, Ex. 2)  One reason for the instant action is that defendants knowingly fail and refuse to enforce their rules and regulations requiring such reviews.  (*Id.*, ¶¶ 50, 55(a), 71.)

The High Risk Sponsored Merchant Rules include the following provisions:

> "Lawfulness of Visa Transactions.  As currently specified in the Visa U.S.A. Operating Regulations, an Acquirer must warrant that High Risk IPSP transactions entered into interchange do not violate, and will not cause an Issuer to violate applicable federal, state, and local laws.  An Acquirer agrees to indemnify and hold harmless the Issuer for any claims and liabilities resulting from an Acquirer's breach of this warranty."
>
> "…

---

[3] For the Court's convenience, Perfect 10 has attached to this brief the portion of Exhibit "2" that addresses High Risk Sponsored Merchants.

"High-Risk IPSPs and High-Risk Sponsored Merchants must comply with applicable Visa Operating Regulations.  An Acquirer is responsible for monitoring these entities' compliance with the Visa Operating Regulations."

(Emphasis added.)

In addition to the specialized rules and regulations enacted for High Risk Sponsored Merchants generally, defendants' relationship with the Stolen Content Websites is even more specialized, as Visa, at Perfect 10's urging, enacted the following regulations in February, 2003, specifically governing the use of "celebrity content" on the Stolen Content Websites:

(1) "Members known by Visa to be processing transactions for such websites will be required to confirm to Visa that any celebrity porn site merchant with whom they have a business relationship does not sell material that would cause the Member to violate Visa regulations prohibiting illegal transactions."

(2) "Members registering new celebrity porn site merchants will be required to provide Visa with documentation to demonstrate that the content sold at such websites will not cause the Member to violate Visa regulations that prohibit illegal transactions."

(3) "Members that have registered merchants whom Visa believes pose higher chargeback and financial risk (which include many adult-content websites) are required to validate the ownership of the sites."

*Id.*, Ex. 5, (emphasis added)[4].

**F.    Perfect 10's Actual, Written Notice to Defendants of the Illegal Activities of the Stolen Content Websites**

Since January 2003 Perfect 10 has repeatedly given defendants written notice of specific Stolen Content Websites.  Among other things, Perfect 10 has notified defendants of specific Stolen Content Websites' use of phony Internet registrations, fraudulent unauthorized charges, and infringements of the intellectual property rights of Perfect 10 and others, and theft of the publicity rights of Perfect 10 and others.  (*Id.*, Ex. 5.)  Third parties have also given defendants written notice of the Stolen Content Websites' illegal business practices.  For example, attorneys for Britney Spears and other celebrities have submitted written notices to defendants that they are supporting Stolen Content Websites that openly infringe their publicity rights.  (*Id.*, Ex. 7.)

---

[4] For the Court's convenience, a copy of the relevant portion of Exhibit "5" to the complaint is included in Exhibit "5" hereto.

Defendants continue to fail and refuse to heed that notice.  Hence, the instant action.

**G.     Defendants' Use of the Black List to Prevent Perfect 10 From Obtaining Charge Processing Services from Association Members and ISOs**

**1.     Defendants' Arbitrary Termination of Perfect 10s' Merchant Account**

In Spring 2001, defendants terminated Perfect 10's merchant account with FDC.  FDC claimed that the reason for the termination was that Perfect 10 had high chargeback rates.  In fact, defendants knew that Perfect 10 had been the victim of hackers who were subsequently investigated by the Secret Service.  Defendants also knew that once the hacking issue was resolved, Perfect 10's chargeback ratio returned to one-half of 1%, which was well within Association limits.  (*Id.*, ¶ 28.)

**2.     Defendants' Placement of Perfect 10 on The Black List and the Adverse Consequences of that Listing**

After terminating Perfect 10, defendants listed it and its president on the industry-wide Black List, which defendants call the "Combined Terminated Merchant File" ("CTMF").  The Associations publish the Black List and make it available to all Association Members and ISOs. (*Id.*, ¶¶ 12, 72, 144-145.)  Placement on the Black List is a kiss of death in the credit card industry, because it means that a merchant cannot obtain charge processing from any Association member or ISO.  (*Id.*, ¶¶ 12, 146.)

Putting Perfect 10 and its president on the Black List is a false declaration that Perfect 10 is guilty of improper charges and/or other improper conduct and that providing processing services to Perfect 10 would impose a high risk to any processor.  Defendants know none of that is true. (*Id.*, ¶¶ 72, 144.)  Moreover, defendants do not put Stolen Content Websites on the Black List even though they have impermissibly high chargeback rates of as much as 6%.  (*Id.*, ¶¶ 13, 71.)

In May 2003, Perfect 10 applied for a merchant account with CardService.  Initially, it appeared that CardService was going to enter into a merchant agreement with Perfect 10.  FDC officer Adam Herbert told Perfect 10 that he would recommend plaintiff for a merchant account. (*Id.*, Ex. 5, the relevant portion of which is attached as part of Exhibit "5" hereto for the Court's convenience.)  However, CardService did not do so, and Perfect 10 has been unable to obtain a merchant agreement.  (*See* Complaint, ¶ 144.)

### H.     Perfect 10's Damages

Perfect 10 has suffered damages in the form of diversion of trade, lost profits, injury to goodwill and reputation and dilution of its rights.  Perfect 10 has spent more than $8 million in attorney fees trying to stop the theft of its and third party intellectual property.[5]  (*Id.* ¶¶ 24, 86.)

## III.    STANDARDS APPLICABLE TO THE INSTANT MOTION

"A Rule 12(b)(6) motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."  *Firoozye v. Earthlink Network*, 153 F.Supp.2d 1115, 1119 (N.D. CA 2001). Therefore, to prevail on the instant motion defendants must establish beyond doubt that plaintiff can prove no set of facts that would entitle it to relief.  *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1529 (9th Cir. 1995); *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

"A suit should not be dismissed if it is possible to hypothesize facts, consistent with the complaint, that would make out a claim."  *Hearn v. R.J. Reynolds Tobacco Co.*, 279 F.Supp.2d 1096, 1101 (D. AZ 2003).  In *Firoozye, supra*, this Court explained the applicable standard, as follows:

> Under Rule 12(b)(6), a complaint should not be dismissed unless a plaintiff can prove "no set of facts in support of his claim that would entitle him to relief." … The court must take the non-moving party's factual allegations as true and must construe those allegations in the light most favorable to the non-moving party.  The court must also draw all reasonable inferences in favor of the non-moving party.

(*Firoozye*, 153 F.Supp.2d at 1127, citations omitted.)

Consistent with those rules, plaintiff may offer facts not plead in the complaint to support its claims.  *Horton v. Marovich*, 925 F.Supp. 532 (N.D. Ill. 1996).  In that case the court held as follows:

> However, the Court notes that a plaintiff 'is free, in defending against a motion to dismiss, to allege without evidentiary support any facts he pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved … would entitle him to judgment.

---

[5] It is no coincidence that soon after Perfect 10 filed this case, defendants finally returned a $30,000 "security deposit" that defendants required plaintiff to pay in 2001 in order to continue processing and that defendants had wrongfully withheld for more than three years.

1  (*Id.*, at 536, citations omitted.)

2  　　As set forth below, Perfect 10 in the case at bar has alleged sufficient facts to sustain its

3  claims, and defendants have provided no basis for the Court to grant their instant motion.

4  **IV.　ALTHOUGH DUTY IS NOT AN ELEMENT OF ANY OF PERFECT 10'S CAUSES
       OF ACTION, DEFENDANTS HAVE A DUTY TO POLICE STOLEN CONTENT**

5  **WEBSITES**

6  　　Defendants' contention that they cannot be responsible to Perfect 10 for their misconduct

7  unless they owe a duty to Perfect 10 is without any legal authority and is wrong as a matter of

8  law.[6]  Not one of Perfect 10's causes of action depends upon the establishment of a duty as an

9  element.  Perfect 10's copyright and trademark claims are based on federal law that requires the

10  presence of certain circumstances before secondary liability can attach, but a "duty" is not one of

11  them.  Defendants' secondary liability for unfair competition and violation of Perfect 10's

12  publicity rights under state law is based on principles of aider and abettor liability, which also do

13  not require proof of duty.  "No California case, however, holds that a party must owe the plaintiff

14  a duty before he or she can be held liable as an aider and abettor."  *Neilson v. Union Bank of*

15  *California*, 290 F.Supp.2d 1101, 1133 (C.D. Cal. 2003).

16  　　Even if duty were an element of any of Perfect 10's claims, which it is not, the allegations

17  in this case demonstrate that defendants have "assumed a duty to act" by undertaking to prevent

18  the wrongful conduct alleged in the complaint.  Duty in the context of the law of common law

19  torts may be established in two ways.

20  　　First, as defendants concede, if this were an action for negligence or some other tort that

21  required a finding of duty, they would be liable if they "assumed a duty to act."  (Motion 7:19,

22  citing 2 Dobbs, *The Law of Torts*, § 314, at 853 (2001); *see also*, e.g., *McGuigan v. Southern*

23  ────────────

24  [6] Defendants' "duty" argument appears to be an appeal that public policy precludes this Court
    from finding that defendants are responsible for "the global economy."  The appeal fails, for at

25  least two reasons.  First, this case is not about the global economy.  The number of Stolen Content
    Websites is in the hundreds, not the "millions" that use defendants' system.  Second, defendants

26  are not above the law.  If anything, public policy dictates that defendants be even more
    accountable because of the enormous harm their economic might makes them capable of inflicting

27  on consumers, merchants, and whole industries.

28

1   *Pacific Company*, 112 Cal.App.2d 704, 718 (1952) ("[i]t is elementary law that the voluntary

2   assumption of a duty by affirmative conduct creates the duty to use care in performing the

3   assumed task.  Prosser on Tort, pp. 194-197)"; *Mid-Cal National Bank v. Federal Reserve Bank of*

4   *San Francisco*, 590 F.2d 761, 763 (9th Cir. 1979) ("[t]he California legislature has determined that

5   a person who undertakes an activity owes a duty to others to exercise ordinary care or skill.

6   Cal.Civ.Code § 1714.")  Unlike the instant action, in each of the above-cited cases duty was an

7   element of a common tort that was at issue.

8   Second, defendants correctly state that duty ma be shown by the existence of a "special

9   relationship" between defendants and the Stolen Content Websites, citing *Mid-Cal*, *supra*, 590

10   F.2d 761, 73 and 2 Dobbs, *The Law of Torts*, § 314, at 853 (2001).  Perfect 10's complaint

11   contains allegations that establish both that defendants have assumed a duty to act and that they

12   have a special relationship with the Stolen Content Websites.

13   The facts alleged in the complaint clearly demonstrate that defendants are themselves so

14   cognizant of their "special relationship" with the Stolen Content Websites, particularly celebrity

15   porn cites, that they have undertaken a duty to regulate them by establishing specially crafted rules

16   and procedures to deal with the problems they pose.  Visa requires that acquirers, including

17   defendants Humboldt, FDC and CardService (all of which specialize in servicing adult content

18   websites, including celebrity porn cites) engage in numerous activities that are above and beyond

19   what they would do for the vast preponderance of merchants (both online and "brick-and-mortar").

20   For example, the Acquirer must (i) perform a comprehensive risk and financial review of

21   the High Risk Sponsored Merchants; (ii) provide ongoing reports on High Risk Sponsored

22   Merchants activity on a monthly basis in an electronic format specified by Visa; and (iii) conduct

23   reviews of the High Risk Sponsored Merchants' website.  Also reflective of this specialized

24   relationship is the fact that Visa requires High Risk Sponsored Merchants to pay specially elevated

25   registration fees as well as fines for failure to comply with registration requirements.  (Complaint,

26   Ex. 2.)

27   Beyond the specialized rules and regulations enacted for High Risk Sponsored Merchants

28   generally, defendants' relationship with the Stolen Content Websites is even more specialized, as

1    Visa, at Perfect 10's urging, enacted regulations in 2003 that specifically governed the use of

2    "celebrity content" on the Stolen Content Websites.  (*See* Section II(E), *supra*.)  Although

3    defendants have failed and refused to enforce these rules, their existence is another example of the

4    supervision and control defendants have undertaken to exercise over Stolen Content Websites.

5    The rules specifically require Association members to confirm that no "celebrity porn site

6    merchant" whom they or their ISOs service is engaging in illegal transactions and that their

7    content does not violate the law.  Members must also validate the true ownership of the sites.

8    (Complaint, Ex. 2.)

9         These regulations, of course, have gone largely unenforced.  That notwithstanding, the

10   regulations indicate that above and beyond defendants' special relationship with High Risk

11   Sponsored Merchants generally, their relationship with Stolen Content Websites in particular is

12   further specialized by virtue of the *type of content* such websites offer.  In other words, rather than

13   being content-neutral, the above regulations are exclusively aimed at Stolen Content Websites

14   offering one particular sub-set of content—adult celebrity images.

15        Finally, one other fact that Perfect 10 has alleged that supports the existence of a "special

16   relationship" between defendants and Stolen Content Websites is that defendants permit such

17   websites to utilize their network for processing transactions despite high chargeback ratios well

18   above MasterCard and Visa established limits.  (Complaint ¶ 13.)  While chargeback ratios at this

19   heightened level would normally earn a merchant a place on the Black List, it appears in many

20   cases that the Stolen Content Website merchants are afforded preferential treatment and not placed

21   on this list.  (*Id.*)  While most member banks and third-party processors refuse to acquire for

22   pornographic websites, in part due to the chargeback issue, defendant FDC, for example,

23   specializes in servicing Stolen Content Websites because by charging them significantly more

24   than conventional merchants pay for the same services, including by levying fees of as much as

25   $100 per chargeback, FDC significantly increases its profit margins.  (*Id.*, ¶ 18.)

26        In sum, defendants' relationship with the Stolen Content Websites is far more specialized

27   than their relationships with merchants generally.  Defendants have (i) special requirements that

28   must be met before they will process transactions for High Risk Sponsored Merchants, a group to

1   which Stolen Content Website merchants belong; (ii) enacted special, *content based* regulations

2   for Stolen Content Websites offering celebrity content; and (iii) permitted Stolen Content

3   Websites with chargeback levels far exceeding acceptable association thresholds to continue to

4   accept MasterCard and Visa because of the high chargeback penalties they return to defendants.

5    Defendants' very particularized relationship with Stolen Content Website merchants

6   presents a markedly different situation from that present in *Emery v. Visa International Service*

7   *Association*, 95 Cal.App. 4th 952, 962 (2002), where plaintiff sought to "ascribe[] liability to

8   VISA for its failure to police <u>millions of merchants</u> who allow payment with a VISA card."

9   (emphasis added).   First of all, in contrast to *Emery*, Perfect 10 is not seeking to hold defendants

10   liable for their failure to police millions of merchants.  Rather, as defendants themselves

11   acknowledge, the Stolen Content Websites represent a specialized <u>"tiny fraction of the many</u>

12   <u>millions of retailers that participate in the defendants' system."</u> (Motion, 9:7-8.)  Making

13   defendants responsible for policing this "tiny fraction" is hardly the same as forcing them to be

14   "global policeman," a burden the Court was unwilling to foist upon Visa in *Emery*.  (*Emery*, 95

15   Cal. App.4th at 965-966.)  Moreover, defendants should not be permitted to hide behind the fact

16   that given the millions of retailers that participate in defendants' system, they do not know who

17   this "tiny fraction" of Stolen Content Website merchants are.  Over the course of 2003, Perfect 10

18   has taken pains to identify these merchants to defendants.  (Complaint, ¶¶ 62-66, Exs. 1, 3, 4, 5.)

19   In any event, given their status as High Risk Sponsored Merchants, Stolen Content Websites

20   merchants have specialized contracts with defendants and should therefore be readily identifiable

21   in any case.

22    Another significantly distinguishing feature between this case and *Emery* is that in *Emery*,

23   the Court found that there was no evidence "that VISA exercised a right to control the lottery

24   merchants so as to create an agency by conduct." *Emery*, 95 Cal. App.4th at 960.   In sharp

25   contrast, Visa directly exercised control over the Stolen Content Website merchants with respect

26   to the conduct most squarely at issue in this case by establishing specific regulations aimed at

27   stemming the tide of unauthorized celebrity websites.  While these regulations were largely

28   fruitless as they lacked the teeth of enforcement, their mere enactment points toward a direct

1    relationship with the Stolen Content Website merchants that was missing in *Emery* with respect to

2    the lottery merchants.  Moreover, this control is further amplified by the fact that defendants

3    review the content of Stolen Content Websites.[7]  Although no duty is required under any causes of

4    action Perfect 10 has alleged, defendants' direct, and extremely specialized, relationship with the

5    "tiny" group of Stolen Content Merchants makes the imposition of a legal duty upon defendants

6    an extraordinarily less burdensome proposition than it was in *Emery*.

7         Defendants next contend that to impose upon them a legal duty would contravene the

8    teaching of *Sony Corp. v. Universal Studios, Inc.*, 464 U.S. 417 (1984).  Defendants' citation to

9    Sony is predicated on the fact that they are "arms-length providers of content-neutral" services."

10   (Motion, 9:25.)  However, defendants' provision of transaction-processing services cannot

11   properly be described as either "arms-length" or "content-neutral" when juxtaposed beside Sony's

12   manufacturing of VTRs.   As stated above, defendants regularly review (or purport to do so) the

13   content of the Stolen Content Websites, have enacted special rules and regulations just to deal

14   with them and, in particular, celebrity porn sites, and allow them to process transactions even in

15   the face  of excessive chargeback ratios.  Moreover, defendants' relationship with Stolen Content

16   Website merchants is further colored by the fact that for the better part of 2003, Perfect 10

17   continually appraised defendants of these merchants' misdeeds.  Viewed collectively then,

18   defendants' intimate and special relationship with this "tiny fraction" of merchants stands in sharp

19   contrast to Sony's genuinely "arms-length" relationship to millions of end-purchaser's of VTRs

20   with whom they genuinely have little to no connection.

21        Moreover, while Sony's provision of VTRs can legitimately be characterized as content

22   neutral, the same cannot be said of defendants' provision of its transaction processing services.

---

[7] This level of control makes *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999) similarly inapposite.  Network Solutions' involvement was limited to translating domain-name combinations to a registrant's IP address and routing the information or command to a corresponding computer.  They didn't engage in any kind of control or monitoring.  This contrasts sharply, of course, with defendants, who have not only reviewed the content of Stolen Content Websites but have also attempted to exercise control over them, through the establishment of content-specific regulations.  (Complaint, ¶¶ 50, 71; Ex. 5.)

1   With respect to Stolen Content Website merchants, defendant Visa attempted to exert control over

2   them by enacting regulations that specifically discriminated <u>on the basis of content</u>.  These

3   regulations were aimed not at merchants generally, or even adult online merchants generally, but

4   rather specifically at online purveyors of adult celebrity content.  This is not the provision of

5   services in a content neutral fashion.

6        Finally, the banking cases defendants cite to for the proposition that a bank owes no duty

7   to third parties to control the activities of its depositors are also easily distinguishable from the

8   case at hand.  In *Mid-Cal*, *supra*, 590 F.2d at 761, for example, noticeably absent were any

9   allegations of a "special relationship" between the bank and its depositors that would warrant the

10  imposition of a duty for purposes of a negligence action.  In contrast, although Perfect 10 is not

11  required to allege a duty because it is not asserting a negligence claim, the Complaint is

12  nevertheless replete with allegations regarding such a "special relationship" between defendants

13  and the Stolen Content Website merchants sufficient to support the existence of such a duty.  As

14  discussed earlier, *Emery* is distinguishable for the same reasons.[8]

15       As for *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532 (1998), although the California

16  Court of Appeal held (once again, in connection with a negligence action where duty is an element

17  of the tort), that the banks had no duty to monitor depositors that would give rise to a cause of

18  action by third parties, the bank's relationship with the depositors was nothing like defendants'

19  relationship with the Stolen Content Website merchants.  The bank in Chazen simply had an arms-

20  length contractual relationship with its depositors.  In contrast, defendants—knowing full well that

21  Stolen Content Website merchants present a high risk—review the content of the Stolen Content

22  Websites as well as perform a comprehensive risk and financial review of their owners.

23  Complaint, ¶¶ 50, 71, Ex. 2.)  In further contrast, while the bank in *Chazen* had no reason to

24  suspect wrongdoing on the part of its depositors, defendants have been made aware of the Stolen

25  _____

26  [8] In another case cited by defendants in this regard, *Federal Deposit Ins. Corp. v. Imperial Bank*,
    859 F.2d 101, 104 (9th Cir. 1988), the Court never even reached the question of what sort of duty
27  is owed to a depositor because it held that the evidence refuted the FDIC's argument that the entity
    in question was ever a depositor in the first place.

28

Content Websites' misdeeds for over a year now by Perfect 10.  (Complaint, ¶¶ 62-64, Ex. 5.)
Finally, while the *Chazen* Court relied upon Cal. Financial Code §§ 952-53 which states that a
bank has no duty to monitor trust accounts for breaches of fiduciary duty, Visa regulations for
High Risk Sponsored Merchants state, in essence, the opposite:  "<u>An Acquirer is responsible for
monitoring these entities' compliance with the Visa Operating Regulations.</u>"  (emphasis added.)
(Complaint, Ex. 2.)

In contrast to the banking cases defendants cite, their relationship and knowing degree of
involvement with the Stolen Content Websites make this case more akin to *Neilson v. Union Bank
of California*, 290 F.Supp.2d 1101 (C.D. Cal. 2003).  In *Neilson*, the Central District of California
recently denied a motion to dismiss a suit by a class of third party investors who alleged that a
bank knowingly aided and abetted a debtor in a scheme to defraud them.  The court held as
follows:

> Under California law, "[[l]iability may … be imposed on one who
> aids and abets the commission of an intentional tort if the person …
> knows the other's conduct constitutes a breach of duty and gives
> substantial assistance or encouragement to the other to so act.

(*Id.*, at 1118.)

In denying defendant's motion to dismiss  the complaint—which included a claim for
statutory unfair competition pursuant to Cal. Bus. & Prof. Code § 17200—the Court relied upon
allegations that defendant banks knowingly provided substantial assistance to the primary
wrongdoer (including by allowing him to violate the banks' own policies) to the detriment of the
third party investors, without which his illegal scheme could not flourish.  Although the facts in
*Neilson* are of course not identical with ours, the principal is clear:  under certain circumstances,
such as those present in this case, a bank can be secondarily liable to an unrelated third party for
the wrongdoings of its clients.

Lastly, the "policy" concerns defendants contend would be created through the imposition
of a duty upon them to police Stolen Content Websites are a complete red-herring.  Citing to *Mid-
Cal* and *Emery*, defendants argue that if they were forced to police "merchants" the banking
system would be thrown up in arms.  As explained earlier, defendants themselves have admitted

1   that the Stolen Content Merchants comprise but a "tiny fraction" of their overall merchant-base.

2   Moreover, given Stolen Content Website merchants' status as High Risk Sponsored Merchants,

3   defendants already purport to scrutinize such merchants (and the content of their websites) with an

4   extra degree of care, including through regulations aimed at stolen celebrity content specifically.

5   The continued proliferation of such content, along with other fraudulent schemes, suggests

6   defendants are not doing their job.  Nonetheless, the Court should not be persuaded by defendants'

7   contention that the sky would fall down if they only did what they were supposed to do and

8   controlled this tiny group of rogue merchants.

9   **V.    PERFECT 10 HAS PROPERLY STATED CLAIMS FOR DEFENDANTS'**
        **SECONDARY LIABILITY FOR COPYRIGHT INFRINGEMENT**

10

        **A.    Contributory Infringement**

11

12          As an initial matter, although defendants are correct in that there are two elements

    necessary to prove liability for contributory copyright infringement—knowledge and material

13
    contribution—they misstate the most current Ninth Circuit standard as far as knowledge is

14
    concerned.  Defendants incorrectly claim *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir.

15
    2004) requires "actual knowledge of the third party's direct infringement." Motion at 11:18-19.

16
    What the court in *Ellison* actually held was, "[w]e have interpreted the knowledge requirement for

17
    contributory copyright infringement to include both those with *actual knowledge* and those who

18
    *have reason to know* of direct infringement." (*Id.*, emphasis in original).  While defendants assert

19
    that Perfect 10's allegations meet neither the knowledge or material contribution prong, their

20
    Motion focuses only on the latter.  Accordingly, while the focus of this section of the Opposition

21
    will be on material contribution, it should be noted that Perfect 10 has adequately alleged that

22
    defendants either knew, or had reason to know, of the infringements.[9]  (Complaint, ¶¶ 19-20, Ex.

23

24  [9] Moreover, although not part of their copyright argument, in defendants' factual background
    section, they also assert that "Perfect 10 has not specifically identified, either in its complaint or in

25  any of the letters or emails sent to any defendant even one 'Stolen Content Website' infringing any
    trademark, copyright or other right belonging to Perfect 10."  (Motion, 5:17-20.)  This is

26  absolutely false.  Among other things, although it is not attached to the Complaint, in December
    2003, Perfect 10 sent defendants two Digital Millenium Copyright Act notices, even though none

27  of the defendants are Internet Service Providers.  These notices listed the Internet addresses

28

1   5.)

2   As far as the material contribution prong is concerned, short of actually supplying the

3   infringing images themselves, defendants' contribution to the infringing acts directly committed

4   by the Stolen Content Websites could hardly be more substantial.  Without defendants' transaction

5   processing services, the ability of Stolen Content Website merchants to distribute infringing works

6   for money over the Internet would be extraordinarily diminished, if not thwarted altogether.

7   Defendants' branded payment cards are the primary way by which customers pay to view Stolen

8   Content Websites.  Acceptance of MasterCard and Visa is in fact so expected by consumers as a

9   form of online payment, that permission from MasterCard and Visa to accept their cards is

10   tantamount to a pre-condition for running a successful online business, and gives such websites a

11   significant competitive advantage.  (Complaint, ¶ 19.)

12   The capacity of Stolen Content Websites to sell their stolen wares would effectively be

13   crippled without the help of defendants' services.  Given the virtually indispensable nature of what

14   defendants are providing, this case falls right along the tracks laid down by the Ninth Circuit in

15   *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996).  In *Fonovisa*, owners of

16   copyrights and trademarks for musical recordings sued operators of a swap meet for infringement

17   based on sales of counterfeit recordings by independent vendors at the meets.  In holding that the

18   allegations in the case were sufficient to show material contribution to the infringing activity, the

19   court noted, "[i]ndeed, it would be difficult for the infringing activity to take place in the massive

20   quantities alleged without the support services provided by the swap meet.  *See also*, *A&M*

21   *Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001) (affirming finding of material

22   contribution where district court found "[w]ithout the support services defendant provides,

23   Napster users could not find and download the music they want with the ease of which defendant

24   boasts.").

25   Moreover, defendants' assistance with regard to the Stolen Content Websites' infringing

26   _____

27   corresponding to specific Perfect 10 copyrighted images misappropriated by various Stolen
Content Websites that defendants support.  Defendants, however, still process transactions for

28   these websites and the images remain.

1   acts is far more material that the "site and facilities" provided in *Fonovisa* when one considers

2   defendants' monopolistic power over processing Internet transactions.  In *Fonovisa*, although the

3   operation of a swap meet certainly contributed to the infringement of plaintiffs' copyrighted

4   works, there were still a variety of other places/means that could have equally contributed to the

5   same offense.  In contrast, when it comes to the online purchase and distribution of goods over the

6   Internet, defendants branded cards services are virtually the "only game in town."  This is also the

7   case with defendant FDC, since it is one of the very few acquiring banks that will process for

8   pornographic websites.  (Complaint, ¶ 18.)  The bottom line is clear:  if a Stolen Content Website

9   merchant wishes to make money from the unauthorized sale and distribution of others' works, he

10   or she has no choice but to go through defendants.

11          While defendants will undoubtedly argue that the exact same thing can be said of the

12   electric company, the circumstances underlying these relative forms of contribution are entirely

13   different.  First, and most critically, the electric company has no knowledge of how its "currents"

14   are being used.  In contrast, defendants—even completely independent of Perfect 10's

15   notifications—possess, or at least should possess, such knowledge by virtue of their reviewing

16   websites.  This factor, of course, has massive ramifications for defendants' *ability to control the*

17   *infringing conduct*, a topic that will be discussed extensively below in the discussion on vicarious

18   liability.  In addition, the fact that defendants did not take any actions with respect to the specific

19   information regarding infringing images that Perfect 10 provided them also supports a finding of

20   contribution.  "We agree that if a computer system operator learns of specific infringing material

21   available on his system and fails to purge such material from the system, the operator knows of

22   and <u>contributes</u> to the infringement."[10]  *Napster*, *supra*, 239 F.3d 1004, 1021 (emphasis added).

23

---

24   [10] Defendants' assertion that *Napster* requires "personal conduct that encourages or assists in the
     infringement," in order to find a material contribution is not accurate.  To the contrary, after citing
25   the classic two part test for contributory infringement articulated in *Gershin Publ'g Corp. v.*
     *Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971), the court in *Napster* states,
26   "Put differently, liability exists if the defendant engages in personal conduct that encourages or
     assists the infringement."  (*Napster*, *supra*, 239 F.3d 1004, 1019.)  Therefore, personal conduct is
27   one way, but not the only way, to make a material contribution to infringement.

28

1   Second, electric companies "contribute" by delivering their service to an actual, bona fide

2   physical addresses where an individual or business is located.  In contrast, defendants process

3   transactions for Stolen Content Websites with sham Internet registrations with bogus addresses

4   and contact information that are virtually impossible to track down.  (Complaint, ¶ 6.)  A classic

5   example of one of these phony addresses is BELIZE CITY, BZ BZ BZ; or Box 821 The Valley

6   AI.  (Complaint, ¶ 66.)  By failing to require that the recipients of its services provide *legitimate*

7   contact information, defendants are essentially helping to conceal the identities of the direct

8   infringers—the owners of the Stolen Content Websites.  *Fonovisa* suggests that protecting

9   identities of infringers might itself be grounds for finding material contribution.[11]

10   Third, while electric companies provide background services (as do phone and water

11   companies) that are necessary for the functioning of any business environment, defendants'

12   contribution comes into play <u>at the actual point of sale and distribution</u>.  This is critical because

13   Section 106(3) of the Copyright Act states that it is the exclusive right of a copyright holder, such

14   as Perfect 10, "<u>to distribute copies . . . of the copyrighted work to the public by sale</u> . . ."  17

15   U.S.C. § 106(3).   (emphasis added).  Accordingly, given that defendants' contribution effectuates,

16   at the point of sale, the Stolen Content Websites' unauthorized commercial distribution of stolen

17   Perfect 10 property, such contribution absolutely "bear[s] a direct relationship to the infringing

18   act[]"  (*See Livnat v. Lavi*, 46 U.S.P.Q. 2d (BNA) 1300, 1303 (S.D.N.Y. 1998).  Moreover,

19   because defendants process transactions for Stolen Content Website merchants with knowledge of

20   their wrongdoing, defendants also act "in concert with the direct infringer[s]."  Id.

21   Defendants are not merely "doing business" with infringers.  Defendants have actual and

22   constructive notice of the Stolen Content Websites' illegal activities.   Yet, defendants have

23

---

24   [11] "The district court apparently took the view that contribution to infringement should be limited to circumstances in which the defendant 'expressly promoted or encouraged the sale of counterfeit

25   products, or in some manner protected the identity of the alleged infringers'  Given the allegations that the local sheriff lawfully requested that Cherry Auction gather and share basic, identifying

26   information about its vendors, and that Cherry Auction failed to comply, the defendant appears to qualify within the last portion of the district court's own standard that posits liability for protecting

27   infringers' identities." *Fonovisa*, *supra*, 76 F.3d 259, 264 (9th Cir. 1996) (citation omitted).

28

1   chosen to actively support those merchants' intentional infringement of Perfect 10's exclusive

2   right to commercially distribute its copyrighted works.

**B.     Vicarious Infringement**

4   Perfect 10 has properly pleaded a cause of action for defendants' vicarious copyright

5   liability because it has alleged that defendants (1) have the right and ability to exercise control

6   over the Stolen Content Websites and their activities and (2) obtain a direct financial benefit from

7   the infringing activities.  *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1171

8   (C.D. Cal. 2002).

**1.     Right and Ability to Control**

10  Although defendants try to portray themselves as nothing more than behind the scenes

11  service providers, the truth is that they are pervasively involved in the business of this relatively

12  small group of Stolen Content Websites on a frequent basis, including down to the level of

13  influencing content decisions.  Defendants' right to control the Stolen Content Websites is

14  established by regulations governing High Risk Sponsored Merchants.  For example, Visa

15  regulations for High Risk Sponsored Merchants state:  " . . . <u>Visa may disqualify a High-Risk</u>

16  <u>IPSP or High-Risk Sponsored Merchant in accordance with the Chargeback Monitoring Program</u>

17  <u>or for other activity that causes undue harm to the Visa system . . . .Visa may prohibit one or more</u>

18  <u>online Merchants from inclusion as a High-Risk Sponsored Merchant in an Acquirer's High Risk</u>

19  <u>IPSP portfolio</u>."  (Complaint, Ex. 2, p. 6 (emphasis added).)  This contractual right to disqualify

20  High Risk Sponsored Merchants for any reason gives defendants the right to control Stolen

21  Content Website merchants. "The ability to block infringers' access to a particular environment

22  for any reason whatsoever is evidence of the right and ability to supervise."  *Napster*, *supra*, 239

23  F.2d 1004, 1023, citing *Fonovisa*, ("Cherry Auction had the right to terminate vendors for any

24  reason whatsoever and through that right had the ability to control the activities of vendors on the

25  premises.")  *See also*, *Religious Technology Center v. Netcom*, 907 F.Supp. 1361 at 1375-76 (N.D.

26  Cal. 1995 (indicating the plaintiff raised a genuine issue of material fact regarding ability to

27  supervise by presenting evidence that an electronic bulletin board service can suspend subscriber's

28  accounts.)

1    In addition to having the right, there is also substantial evidence that defendants have the

2    *ability* to control the infringing activity.  To begin with, defendants' review the content of the

3    Stolen Content Websites.  (Complaint, ¶¶ 50, 51, 71.)  Although defendants relegate these

4    allegations to a footnote, this "pre-screening" makes defendants far more than just a "back-end

5    transaction processing service[]," and affords them the opportunity to control the content on

6    Stolen Content Websites at the root level before agreeing to process transactions for them.[12]

7    Beyond the initial screening, Visa regulations also contemplate an ongoing monitoring of the

8    Stolen Content Websites, at least on the part of the Acquirer banks.  The regulations state, "An

9    Acquirer is responsible for <u>monitoring</u> these entities compliance with Visa Operating

10   Regulations."  (Complaint, Ex. 2, p. 6 (emphasis added).)

11   Beyond pre-screening and monitoring Stolen Content Websites, defendants' ability to

12   control the infringing conduct is perhaps best encapsulated by their past efforts at corrective

13   action—enacting "celebrity porn" regulations in February 2003 <u>specifically related to the</u>

14   <u>infringing activity</u>.[13]  *See Religious Technology Center v. Netcom*, 907 F.Supp. at 1375 (right and

15   ability to control where "police" powers exercised in the past).  In its pre-litigation notice letters to

16   defendants that prompted these regulations, Perfect 10 advised defendants its stolen images almost

17   always appeared on celebrity websites where virtually all of the content is stolen.  Accordingly,

18   these content specific regulations were directly related to the infringing activity; had defendants

19   only finished the job the passage of these regulations trumpeted, the infringing conduct would

20   have dramatically decreased by now.  Moreover, the enactment of such regulations—specifically

21   targeted at influencing one particular subset of content—belies defendants' contention that they

22   "lack any ability to dictate content."  Motion at 14:10-11.  This contention is further undermined

23

[12] Indeed, in May 2003 when FDC and CardService led Perfect 10 to believe they were going to
24   offer processing services to it, defendants required Perfect 10 to provide them with a password so
that they could review the content of the website.  (Complaint, Ex. 5.)

25
[13] Although the control defendants exercised by virtue of these regulations is squarely related to
26   the infringing activity, the cases defendants' cite for the proposition that this is a requirement are
inapposite.  They are cases in which someone is seeking to hold a parent liable for the actions of
27   its subsidiary.  This is not the theory on which Perfect 10 is trying to base defendants' vicarious

28

1   by the fact that Perfect 10 is informed and believes that defendants have engaged in

2   communications with one another (as well as with Stolen Content Website merchants) regarding

3   the removal of underage, bestiality and rape content.  "This ability to control other types of images

4   belies any attempt to argue that Cybernet does not exercise sufficient control over its webmasters

5   to monitor and influence their conduct or to deny copyright offenders the benefits of its services."

6   *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1173 (C.D. Cal. 2002).

7          Defendants' ability to control the infringing conduct on the Stolen Content Websites is

8   further buttressed by the relatively small number of Stolen Content Websites.  Stolen Content

9   Websites are part of a specialized group of High Risk Sponsored Merchants for whom, as

10  explained above, defendants have special rules and regulations.  Moreover, Perfect 10 has further

11  circumscribed this group for defendants by specifically appraising them of the identities of the vast

12  preponderance of websites and webmasters that are selling stolen celebrity content, including

13  Perfect 10 content.  (Complaint, Ex. "5.")

14         Given that defendants pre-screen websites, monitor them, and have enacted content-

15  specific regulations directly related to the infringing conduct, they are far more pervasively

16  involved with the direct infringers than were the trade show operators in *Adobe Systems, Inc. v.*

17  *Canus Productions, Inc.*, 173  F.Supp. 2d 1044 (C.D. Cal. 2003).  In addition to the

18  aforementioned factors, Visa regulations require the Acquirer bank (i.e., FDC) to "provide

19  ongoing reports of High-Risk Sponsored Merchant activity on a monthly basis" to Visa.  Lastly,

20  an important distinction between this case and *Adobe* is that in *Adobe*, the defendants were

21  proprietors of weekly computer fairs who only intermittently crossed paths with the infringers, and

22  even then, not at the point of sale and distribution.  In contrast, defendants are involved *every time*

23  *the Stolen Content Websites sell and distribute infringing images*.

24                          **2.     Direct Financial Benefit**

25         Despite defendants best efforts to pair down Perfect 10's allegations regarding financial

26  benefit to just those contained in paragraph 81 of the Complaint, Perfect 10 has actually alleged

27  ────────────────────

28  liability.

1   that defendants are reaping a direct financial benefit from the infringing activity in a variety of

2   ways.  First of all, in the case of the Acquirer banks (e.g., defendant FDC), Perfect 10 has alleged

3   that they actually buy the charge for an infringing transaction from the Stolen Content Website

4   merchant at a discount, and then pay the proceeds to the merchant.  (Complaint, ¶ 9.)  The manner

5   in which these proceeds flow make this case similar to *Perfect 10, Inc. v. Cybernet Ventures, Inc.*,

6   213 F.Supp. 2d 1146, 1172 (C.D. Cal. 2002), where the Court concluded there was a strong

7   likelihood that Perfect 10 could establish a direct financial interest based on evidence that "all the

8   money flows directly to Cybernet before some of it is returned to the individual site owners as

9   'commissions.'"

10          Perfect 10 has also alleged that defendants reap a direct financial benefit from the Stolen

11   Content Websites by levying fines against them for chargebacks of as much as $100 per incident.

12   (Complaint, ¶ 18.)  As previously stated, Perfect 10 has alleged that the Stolen Content Websites

13   that are responsible for stealing Perfect 10 images also typically engage in other fraudulent and

14   deceptive acts, causing their chargeback ratios to frequently spike above established MasterCard

15   and Visa limits.  (Complaint, ¶ 6.)  Although it is against their rules, defendants have conspired to

16   allow Stolen Content Websites to accept MasterCard and Visa despite these high chargeback

17   ratios because of their high volume and because of the exorbitant chargeback fees they generate.

18   (Complaint, ¶¶ 13, 71.)  Certainly the "Faustian bargain" defendants have struck—whereby,

19   because of the substantial fees generated, they permit Stolen Content Website merchants to accept

20   MasterCard and Visa despite such merchants' openly engaging in theft and other bad acts—is

21   suggestive of a "symbiotic relationship" of the type discussed in *Adobe*, *supra*, 173 F.Supp.2d at

22   1053.

23          Perfect 10 has also alleged that Visa and MasterCard receive fees on every transaction

24   from a Stolen Content Websites.  (Complaint ¶ 11.)  While defendants will undoubtedly argue that

25   these fees are an insignificant percentage of their overall revenue stream, that is not germane to

26   determining direct financial benefit.  "The essential aspect of the 'direct financial benefit' inquiry

27   is whether there is a causal relationship between the infringing activity and any financial benefit

28   that a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's

1    overall profits." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).   Such a causal

2    relationship does exist because the existence of high quality stolen content (such as Perfect 10

3    images) is a draw for consumers to purchase memberships to the Stolen Content Websites, which

4    then results in defendants' receipt of transaction fees.   This causal relationship is similar to that

5    found in Cybernet.   " . . . [T]he income derived from each website is directly based on the site's

6    initial popularity.   The more consumers appreciate the content of a page, the more money

7    Cybernet receives." *Perfect 10,* 213 F.Supp.2d at 1172.   Lastly, Perfect 10 has alleged that Visa

8    "sponsors" Internet merchants, including "Stolen Content Websites" in exchange for a $750 fee.

9    (Complaint, ¶ 71.)

10   **VI.    PERFECT 10 HAS ALLEGED FACTS SUFFICIENT TO STATE A CLAIM FOR
         DEFENDANTS' LANHAM ACT VIOLATION**

11            Defendants are secondarily liable for violations of the Lanham Act and of state trademark

12   law because they continued to work with websites that they knew engaged in infringement.

13   Defendants, however, cite to *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844 (1982)) to support

14   their position that they are not secondarily liable for trademark infringement.   To the contrary,

15   *Inwood* demonstrates that defendants should be secondarily liable because defendants continued to

16   work with parties <u>whom they knew were violating trademark law</u>.   *Inwood*, 456 U.S. at 852, 855.

17   The Court reasoned that petitioners would be liable if they "continued to sell [the generic drug] to

18   retailers whom they knew or had reason to know were engaging in infringing practices."   The

19   Court went on to find that the petitioners "did not continue to provide drugs to retailers whom they

20   knew or should have known were engaging in trademark infringement."   (*Id.* at fn. 12.)

21            Contrary to the *Inwood* petitioners' responsible behavior of ceasing to provide drugs to

22   retailers who they knew were engaged in trademark infringement, here defendants brazenly turned

23   (and continue to turn) a blind eye to their knowledge that the Stolen Content Websites with whom

24   they work engage in trademark infringement.   Not only did Perfect 10 provide an inordinate

25   amount of notice regarding infringement, defendants knew or should have known of the trademark

26   infringement based on their own review of Stolen Content Websites and their policies.

27   (Complaint, ¶¶ 16, 17, 20, 23, 51, 52, 56, 57, 61-66, 98.)

28

1    All the cases defendants cite inevitably lead to the same conclusion as *Inwood*; defendants

2    are secondarily liable for trademark infringement if they continue to work with websites that they

3    know engage in trademark infringement.  For instance, defendants cite *Fonovisa, Inc. v. Cherry*

4    *Auction, Inc.*, 76 F. 3d 259 (9th Cir. 1996) for the proposition that the "supplier's product" must

5    be used to directly infringe another's right.  Defendants actually admit at page 20, footnote 13 of

6    their motion that *Fonovisa* does not require that defendants supply the product that is infringed.  In

7    fact, like *Inwood*, *Fonovisa* held that defendants may be liable for trademark infringement because

8    they continued to work with vendors who they knew were engaged in trademark infringement.

9    "*Hard Rock Cafe's* application of the *Inwood* test is sound; a swap meet cannot disregard its

10   vendors' blatant trademark infringements with impunity.  Thus, Fonovisa has also stated a claim

11   for contributory infringement."  *Fonovisa*, 76 F.3d at 265 (emphasis added).

12   Defendants' reading of *Fonovisa* places too much weight on *Inwood's* specific wording of

13   the term "supply."  In *Inwood,* "supply" was used because the drug manufacturer was supplying

14   the actual drug pills that were being used to infringe.  *Fonovisa*, like *Inwood* and *Hard Rock Cafe*,

15   all stand for the same proposition: Defendants may not simply turn a blind eye to knowing

16   infringements, instead they must cease their relationships with known infringers.  *See Lockheed*

17   *Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980 (9th Cir. 1999) (holding that *Fonovisa*

18   specifically adopted *Hard Rock Café's* expansion of Inwood's "supplies a market requirement.").

19   *Lockheed* held that when "weighing a fact pattern in the contributory infringement context without

20   the convenient 'product' mold dealt with in *Inwood Lab.*, we consider the extent of control

21   exercised over third party's means of infringement."  (*Id.*, 194 F.3d at 984.)

22   Under the extent of control test, Perfect 10 is clearly distinguishable from *Lockheed*.  In

23   *Lockheed*, defendant NSI's involvement was limited to translating domain-name combinations to

24   a registrant's IP address and routing the information or command to a corresponding computer.

25   NSI did not control or monitor the information.  Ninety percent of the templates were processed

26   electronically.  (*Lockheed*, *supra*, 194 F.3d at 982.)  Here, defendants not only review the content

27   of Stolen Content Websites but they have also exercised control over them, including through the

28   establishment of content-specific regulations.  Defendants also suggest that *Lockheed* supports

1  their theory that they it would be unreasonable to expect them to monitor the Internet.  In contrast

2  to NSI's monitoring the entire Internet in *Lockheed*, defendants are being asked to monitor a tiny

3  portion of their business, Stolen Content Websites, which because of the high risk nature of their

4  services are already subject to heightened standards of scrutiny.  Furthermore, NSI does, in fact,

5  monitor certain domain names such as "Olympic, Red Cross, or NASA" along with "'obscene'

6  words." *Lockheed*, *supra*, 194 F.3d at 982.  So too should defendants bear responsibility for

7  monitoring the limited number of Stolen Content Websites.

8         Although defendants attempt to argue that *Fonovisa* requires liability only if the service

9  supplier directly controls and monitors the instrumentality used by a third party to infringe the

10  trademark, *Fonovisa* actually requires that in order for a party to be liable for contributory

11  trademark infringement that the party has knowledge and materially contribute to the

12  infringement.  *Fonovisa*, *supra*, 76 F.3d at 264.  As part of material contribution, the Court looked

13  to the site and facilities test and found that defendants likely contributed because they provided

14  space, utilities, parking, advertising, etc.  The Court also stated that merely providing the means

15  for infringement may be enough.  Id.  Hereto, defendants are providing the means for

16  infringement.  In fact, defendants' actions are even more crucial than those of the swap meet

17  market in *Fonovisa*.  Without defendants' transactions the Internet would not be a viable means to

18  profit from the trade of stolen merchandise; whereas, in *Fonovisa*, there were other flea markets

19  that may still allow infringements to occur even if Fonovisa ended its involvement with known

20  infringers.

21  **VII.   PERFECT 10 HAS ALLEGED FACTS SUFFICIENT TO STATE A CLAIM FOR
         DEFENDANTS' VICARIOUS LIABILITY FOR VIOLATION OF PUBLICITY**
22       **RIGHTS**

23         Defendants correctly do not argue that there is no liability for aiding and abetting rights of

24  publicity violations as the case law is clear that defendants can be liable for such action.  Instead,

25  defendants contend Perfect 10 did not properly allege that defendants aided and abetted Perfect

26  10's rights of publicity.  Defendants cite to three examples in which they argue that Perfect 10

27  alleged legal conclusions without facts to support its aiding and abetting claim.  This is simply not

28  the case.

1    Perfect 10 alleged that defendants had knowledge and substantially participated in the

2  aiding and abetting.  Under the *Restatement (Second) of Torts*, which has been adopted in

3  California decisions, aiding and abetting liability exists "if [the aider] (a) does a tortious act in

4  concert with the other or pursuant to a common design with him, or (b) knows that the other's

5  conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other

6  to so conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious

7  result and his own conduct, separately considered, constitutes a breach of duty to the third person."

8  *Restatement (Second) of Torts* § 876 (1979).[14]

9    Perfect 10 adequately alleges that defendants had knowledge of the right of publicity

10  violations.  As far as defendants' knowledge of the unfair conduct is concerned, the Complaint

11  specifically alleges that (i) Perfect 10 gave notice of defendants' systematic infringements; and (ii)

12  defendants review the content of the Stolen Content Websites before and after agreeing to process

13  transactions for them.  Perfect 10 has also properly alleged specific ways in which defendants have

14  substantially assisted the Stolen Content Website merchants in their right of publicity violations

15  and thus adequately alleged its right of publicity claim.  *See* generally, section V(A), *supra*.

16  (discussion of defendants' "material contribution" to copyright infringement).[15]  Indeed, in the

17  case of defendant FDC, their assistance becomes particularly crucial in that they are one of the

18  only ISOs that will do business with pornographic Internet merchants.  (Complaint ¶ 18.)

19  Defendants also substantially assist the unfair business acts of the Stolen Content Website

20  Merchants by permitting them to accept MasterCard and Visa cards despite the fact that such

21

22  [14] *Pasadena Unified Sch. Dist. v. Pasadena Fed'n of Teachers*, 72 Cal. App. 3d 100, 113 (1977)
    ("The rule as stated in the Restatement is clearly the law of California.") (citing *Loeb v. Kimmerle*,

23  215 Cal. 143, 150-51 (1932)), disapproved on other grounds in *City and County of San Francisco
    v. United Ass'n of Journeymen*, 42 Cal. 3d 810 (1986) and *County Sanitation Dist. No. 2 v. Los*

24  *Angeles County Employees' Ass'n*, 38 Cal. 3d 564 (1985); *See also*, *Howard v. Superior Court*, 2
    Cal. App. 4th 745, 748-749 (1992) ("[A]iding-abetting focuses on whether a defendant knowingly

25  gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the

26  defendant agreed to join the wrongful conduct.") (quotations omitted).

27  [15] The same underlying facts that support material contribution also demonstrate substantial
    assistance.

28

KING, HOLMES,
PATERNO
& BERLINER LLP

1   websites often run chargeback ratios well in excess of established association limits.  (Complaint,

2   ¶¶ 11-13.)  Finally, defendants process transactions for Stolen Content Website merchants despite

3   the fact that many such merchants—knowing full well they have something to hide—list only

4   sham Internet registrations with bogus addresses and contact information that are virtually

5   impossible to track down.  (Complaint, ¶¶ 6, 66.)  By failing to require that the recipients of its

6   services provide legitimate contact information, defendants are essentially helping to conceal the

7   identities of the direct infringers—the Stolen Content Websites.

8   **VIII.   DEFENDANTS ARE LIABLE FOR VIOLATION OF SECTIONS 17200 AND 17500
        OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE**

9
        **A.   *Emery* Does Not Preclude Secondary Liability for Violations of Cal. Bus. &
10            Prof. Code Section 17200, et. seq.**

11          Defendants' argument that *Emery v. Visa International Service Assoc.*, 95 Cal App. 4th

12   952 (3d Dist. 2002) prevents them from being secondarily liable for an unfair business practice

13   claim predicated on the direct wrongdoing of the Stolen Content Website merchants is simply

14   wrong as a matter of law.  The language defendants quote from *Emery* does state, "The concept of

15   *vicarious* liability has no application to actions brought under the unfair business practices act."

16   (emphasis added).  This statement, however, precludes only secondary liability imposed under

17   Bus. & Prof. Code § 17200, et. seq., *vicariously* (i.e., without knowledge), as opposed to liability

18   based on the *knowing participation* in the wrongful acts of others.  Indeed, the above quotation

19   derives from a distinct proposition in *People vs. Toomey*, 157 Cal. App. 3d 1 (1984), a case which

20   specifically held secondary liability under sections 17200 and 17500 can be established under

21   aiding and abetting principals.

22          *Toomey* involved a seller of discount coupons who made false and misleading sales

23   solicitations and refused to grant refunds to injured customers.  The Attorney General filed a

24   complaint against both Toomey individually and doing business as Holiday Funshine, Inc.

25   ("Holiday") charging Toomey with unfair business practices (§17200) and misleading and untrue

26   advertisements (§17500).   In his defense, Toomey argued that he could not be held liable under

27   sections 17200 and 17500 for the acts of his employees.  While the court agreed to the limited

28   proposition that Toomey's liability must be predicated on his participation in the unlawful

KING, HOLMES,
PATERNO
& BERLINER LLP

practices, it clearly states that, ". . . . <u>if the evidence establishes defendant's participation in the unlawful practices, either directly or by aiding and abetting the principal, liability under section 17200 and 17500 can be imposed</u>." *Toomey*, 157 Cal. App 3d. at 15 (emphasis added). Employing this analysis, the Court found Toomey liable for the misleading solicitations made by his employees.[16]

## B.   **Perfect 10 Has Properly Alleged Defendants Aided and Abetted the Unlawful Acts of the Stolen Content Website Merchants**

Perfect 10 has properly alleged facts supporting defendants' aiding and abetting unfair competition pursuant to the standard set forth in *Toomey*.  Under the *Restatement (Second) of Torts*, aiding and abetting liability exists if "[A] defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct."  *Howard v. Superior Court*, 2 Cal. App. 4th 745, 748-749 (1992) (quotations omitted).

In light of these standards, Perfect 10 has adequately alleged that defendants aided and abetted in the unfair business practices of the Stolen Content Website merchants.  As far as defendants' knowledge of the unfair conduct is concerned, the Complaint specifically alleges that (i) Perfect 10 gave notice to defendants orally, in writing, and via email that defendants are providing critical support for websites that are engaged in the systematic infringement of intellectual property rights of Perfect 10 and others; and (ii) defendants review the content of the Stolen Content Websites prior to agreeing to process transactions for them, as well as monitor them on a periodic basis.  (Complaint, ¶¶ 16, 21, 50, 51, 61-66 Exhibits 2, 3, 5-7.)

As fully set forth above, including in Sections IV (on defendants' exercise of control over the Stolen Content Websites) and V(A) (on defendants' material contribution to the Stolen Content Websites) Perfect 10 has also alleged that defendants have "substantially assisted" the

---

[16] The Court further explained quoting from *People v. Bestline Products, Inc.*, 61 Cal. App. 3d 169, 181 (1976), "All parties to a conspiracy to defraud are directly liable for all misrepresentations made pursuant to such conspiracy and <u>anyone who knowingly aids and abets fraud or furnishes the means for its accomplishment is liable equally with those who actually make the misrepresentations</u>."  (*Id.*, emphasis added.)

1  Stolen Content Website merchants in their unfair conduct.

2  **C.**  **Perfect 10's State Law Claims Are Not Preempted By The Copyright Act**

3  Contrary to defendants' argument, Perfect 10's unfair competition claim is based on many

4  other elements besides copyright law, and accordingly, it cannot be preempted.  Principally, this

5  claim is based upon defendants providing critical support to Stolen Content Websites which

6  deceive consumers through a myriad of tricks and deceptive practices including: charging

7  consumer credit cards without authorization; falsely stating that memberships are free; grossly

8  misstating the number of images they have; requiring consumers to uncheck a small box to avoid

9  charges; promising explicit images and videos of celebrities that do not exist; providing or falsely

10  promising rape, incest and/or bestiality images; spamming; tricking consumers into buying

11  memberships; and appearing to be multiple websites in order to induce consumers to purchase

12  multiple memberships.  (*See* Complaint ¶¶ 6, 20, 52, 67, 68, 127, and Ex. 1.)  None of these

13  deceptive and unlawful activities are related to the Copyright Act and therefore cannot be

14  preempted.

15  In order to determine whether a state law claim is preempted by the Copyright Act, courts

16  must apply a two-prong test:  (1) the work must be within the scope of the subject matter of

17  copyright; and (2) the asserted state law right must be "equivalent to any exclusive rights within

18  the scope of federal copyright."  A right is 'equivalent' to copyright if it "is infringed by the mere

19  act of reproduction, performance, distribution or display."  *Nimmer on Copyright*, § 1.10[B] at 1-

20  12 to 1-13 (1989).  "In order not to be equivalent, the right under state law must have an 'extra

21  element' that 'changes the nature of the action so that it is qualitatively different from a copyright

22  infringement claim."  *Entous v. Viacom Intern'l, Inc.*, 58 U.S.P.Q.2d 1628, 1634 (C.D. Cal., 2001)

23  (case citations omitted, emphasis added); *see also*, *Lattie v. Murdach*, 1997 WL 33803 at *4 (N.D.

24  Cal. 1997) ("If the state law claim involves an 'extra element' not shared by the federal law and

25  that element makes the action qualitatively different from a copyright claim, the state law claim

26  will not be preempted.")[17].

27  _____

28  [17] In *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212-13 (9th Cir. 1998), cited by

To the extent Perfect 10's unfair competition claim is based on the pattern of unlawful and deceptive trade practices referred to above, it clearly contains such "extra elements." It is well established that an unfair competition claim which includes allegations of misrepresentation or deception involves different elements that are not present in a cause of action for copyright infringement and therefore are not preempted. In *Titan Sports v. Turner Broadcasting Systems*, 981 F.Supp. 65, 71 (D.Conn. 1997), for example, the court denied a motion to dismiss an unfair competition claim where, as articulated by the court, plaintiff alleged "an unfair and deceptive scheme by defendants and that in carrying out this deceptive scheme, defendants infringed Plaintiff's copyright and trademark rights." The court held that there was no preemption of the claim for unfair competition on the grounds that the unfairly competitive scheme, of which the infringing conduct was only a part, included an element of deception. The latter constituted the "extra element" precluding preemption of the unfair competition claim. *See also*, *Warner Bros., Inc. v. American Broadcasting Companies, Inc.*, 720 F.2d 231, 247 (2d. Cir. 1983) ("to the extent that plaintiffs are relying on state unfair competition law to allege a tort of 'passing off,' they are not asserting rights equivalent to those protected by copyright and therefore do not encounter preemption."); *Samara Brothers, Inc. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 131 (2d Cir. 1998), *Samara Brothers, Inc. v. Wal-Mart Stores, Inc.*, 529 U.S. 205 (2000) ("we agree that 'intentional deception' constitutes an extra element not required in a copyright infringement claim."); and *Nimmer on Copyright* § 1.10[B][1][e] ("Similarly, crucial to liability under a deceptive trade practices cause of action is the element of misrepresentation or deception, which is no part of a cause of action for copyright infringement.").

As for the portion of Perfect 10's unfair competition claim that is based on the misappropriation of content, this is primarily based on the violation of rights of publicity and is therefore also not preempted by the Copyright Act. (Complaint, ¶¶ 115, 127.) Numerous courts

defendants, the Ninth Circuit held that Kodadek's state law claim was based "solely on rights equivalent to those protected by the federal copyright laws." Perfect 10, however, does not base its unfair competition claim "solely on rights equivalent to those protected by federal copyright." Perfect 10 bases its unfair competition claim upon extra element not shared by federal copyright

have recognized that unfair competition claims that encompass the right of publicity involve

elements that are not equivalent to the rights enumerated under section 106 and are therefore not

preempted.  *See*, e.g., *KNB Enterprises v. Matthews*, 78 Cal.App. 4th 362, 374 (2000) (claim by

copyright owner and assignee of models' right of publicity not preempted since "the right asserted

under the state statute, the right of publicity, does not fall within the subject matter of copyright.");

*Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 623 (6th Cir. 2000) ("As long as plaintiff

states a claim of invasion of personal, state-law rights that are distinct from copyright protections,

the claim will not be preempted.").  As Nimmer explains:  "The 'work' that is the subject of the

right of publicity is the persona, i.e., the name and likeness of a celebrity or other individual.  A

persona can hardly be said to constitute a 'writing' of an 'author' within the meaning of the

Copyright Clause of the Constitution.  A fortiori, it is not a 'work of authorship' under the Act."  1

*Nimmer on Copyright*, §1.10[B][1][c] (2000).

Finally, to the extent that the "misappropriation" portion of Perfect 10's unfair competition

claim concerns theft of copyrighted works, it should still not be preempted since it involves only

the copyrights of third parties, regarding whose works Perfect 10 has no ability to file a copyright

infringement claim.[18]

### D. Perfect 10's State Law Unfair Competition Claims Are Not Congruent With Its Lanham Act Claims

---

law.

[18] The exclusive rights enumerated in section 106 of the Copyright Act do not exist in a vacuum. Rather, section 106 defines only the rights of copyright owners.  "Subject to sections 107 through 120, the *owner of copyright* under this title has the exclusive right to do and to authorize the following … ." (17 U.S.C. § 106, emphasis added).  It is axiomatic that in order for section 301(a) to preempt a claim under state law, that claim must be based on the state law right of a copyright owner.  Section 301(a) does not concern the state law rights of third parties.  Thus, such parties would not possess a right "equivalent to" any of the rights enumerated in section 106 of the Copyright Act.  It is no mere coincidence *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212-13 (9th Cir. 1998) cited by defendants to argue for preemption, is a case in which the person or entity asserting the unfair competition claim that was ultimately preempted was also the copyright owner of the work that was the subject of the unfair competition claim.  By contrast, copyrighted works relevant to Perfect 10's unfair competition and false advertising claims are copyrights owned by third parties.  (See, e.g., Complaint, ¶ 127, alleging unlawful acts of misappropriation of content owned by third party publishers and film owners.)

Defendants' reliance on *Denbicare U.S.A., Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143, 1152-53 (9th Cir. 1996), for the proposition that Perfect 10's state-law unfair competition claims are congruent with Lanham Act claims, is misplaced.  While the unfair competition claim does contain some elements which overlap with the Lanham Act (e.g., allegations of misrepresenting the source or sponsorship, palming off, etc.), this claim is still based on a plethora of allegations that are *not* congruous with the Lanham Act, including: (i) charging consumer credit cards without authorization; (ii) falsely stating that memberships are free; (iii) grossly misstating the number of images they have; (iv) requiring consumers to uncheck a small box to avoid charges; (v) promising explicit images and videos of celebrities that do not exist; (vi) providing or falsely promising rape, incest and/or bestiality images; (vii) spamming; (viii) tricking consumers into buying memberships; and (ix) appearing to be multiple websites, in order to induce consumers to purchase multiple memberships.  (*See* Complaint, ¶¶ 6, 20, 52, 67, 68, 127, and Ex. 1.)

In any event, to the extent that Perfect 10's unfair competition claim does share some congruent elements with its Lanham Act claim, these elements too must not be dismissed either, since—as stated in section VI, *supra.*, Perfect 10's Lanham Act claims are adequately alleged.

**E.    Defendants Have Direct Involvement In Unfair Competition Not Based Upon Aiding And Abetting**

Finally, Perfect 10's Unfair Competition claim is also based upon defendants' direct acts that are not related to aiding and abetting.  Defendants allow competitors who are engaged in various obviously illegal acts to process via MasterCard and Visa, while at the same time they have denied Perfect 10 the ability to process Visa Cards and terminated Perfect 10's merchant account.  (Complaint, ¶¶ 10-13, 26-28.)

**IX.    PERFECT 10 HAS STATED A CLAIM FOR RELIEF FOR LIBEL**

**A.    The Libel Claim Is Timely**

The California Supreme Court's recent opinion in *Shively v. Bozanich,* 31 Cal.4th 1230 (2003) establishes that Perfect 10's libel claim is timely.  *Shively* was a witness in the grand jury proceedings that resulted in O. J. Simpson's indictment.  In September 1996, some of the defendants released a book that contained an allegedly defamatory statement about plaintiff.

1   Plaintiff read the book in December 1996 and filed suit in October 1997.  Although the Court held

2   that Shively's claims were untimely, its discussion of two rules for determining the timeliness of

3   libel claims shows that Perfect 10's claims herein are timely.

4       First, the Court reconfirmed that each new publication of a defamatory statement gives rise

5   to a new cause of action.  Second, the Court reconfirmed that when, as in the case at bar, the

6   defamatory statement is not disseminated to the general public, the statute of limitations is tolled

7   until plaintiff discovers the defamatory statement.  In this case, the complaint establishes that

8   defendants republished their defamation of Perfect 10 as recently as May 2003, seven months

9   before Perfect 10 filed suit.  The complaint also establishes that Perfect 10 did not discover the

10  defamation until at least May 2003.  (Complaint, Ex. "5," and ¶¶ 28 and 146.)

11      Therefore, as set forth more fully below, Perfect 10's libel claim is timely.

12      **1.    A New Limitations Period Began to Run When Defendants
            Republished the Black List During the Year Before Perfect 10 Filed the**
13          **Complaint**

14      "The rule that each publication of a defamatory statement gives rise to a new cause of

15  action for defamation applies when the original defamer repeats or recirculates his or her original

16  remarks to a new audience."  *Shively*, supra, 31 Cal.4th at 1244.  In *Shively*, the "one publication

17  rule" barred plaintiff's claim because the book from which she learned of the defamatory

18  statement was generally available to the public, like a movie or television broadcast.  However, the

19  Court noted that "a new edition or new issue of a newspaper or book still constitutes a new

20  publication, giving rise to a new and separate cause of action and a new accrual date for the

21  purpose of the statute of limitations."  *Id.*, at 1247, n. 7.

22      The Court of Appeal's decision in *Schneider v. United Airlines, Inc.*, 208 Cal.App.3d 71

23  (1989),, is on point.  In that case, United Airlines reported false credit information about plaintiff

24  to TRW.  TRW republished the incorrect credit information to two banks on different occasions.

25  The court held that each republication of the TRW report gave rise to a new claim and, therefore,

26  recommended the statute of limitations, as follows:

27          The single publication rule … does not include separate aggregate
            publications on different occasions.  … In these cases the

28

> publication reaches a new group and the repetition justifies a new cause of action.

*Id.*, at 76, quoting *Kanarek v. Buglioi,* 108 Cal.App.3d 327, 332 (1980).

In the case at bar, the Black List is a credit report for financial institutions to use to decide whether to process credit card transactions for merchants such as Perfect 10.  As in *Schneider*, each time a financial institution obtains the credit information there is a republication to a new audience for purposes of the single publication rule.

Perfect 10's complaint shows that the last republication of defendants' defamation was no earlier than May 2003, seven months before Perfect 10 filed the instant action.  Exhibit "5" to the complaint contains a copy of a May 12, 2003 e-mail from defendant CardService to Perfect 10, with the subject line "Pending Merchant Account."   The e-mail shows that Perfect 10 was applying for a merchant account in May 2003, as a result of the recommendation of FDC officer Adam Herbert, less than one year before Perfect 10 filed the complaint, and that Perfect 10 apparently had been approved.  Yet, as alleged in paragraph 146 of the complaint, Perfect 10 has been unable to obtain credit card services because of its placement on the Black List.  Implicit is that CardService decided not to process for Perfect 10 because it found Perfect 10's listing on the Black List.  Since Perfect 10 filed the complaint within one year after the May 2003 republication, the complaint is timely.

### 2. Perfect 10's Discovery that Defendants Defamed It Was Less than One Year Before Perfect 10 Filed this Case

The second rule that the California Supreme Court reviewed in *Shively*, *supra*, 31 Cal.4th 1230, was that if a party could not reasonably have discovered the facts giving rise to his cause of action for libel any earlier, the limitations period runs from when plaintiff discovered the defamatory matter.  The Court stated as follows:

> We have recognized that in some instances, the accrual of a cause of action in tort is delayed until the plaintiff discovered (or reasonably should have discovered or suspected) the factual basis for his or her claim. … As observed by the Courts of Appeal here and in several other decisions, the discovery rule most frequently applies when it is particularly difficult for the plaintiff to observe or understand the breach of duty, or when the injury itself (or its cause) is hidden or beyond what the ordinary person could be expected to understand.

KING, HOLMES,
PATERNO
& BERLINER LLP

…

> That rule has been applied when the defamatory statement is hidden from view as, for example, in a personnel file that generally cannot be inspected by the plaintiff.  The rationales offered in support of the application of the discovery rule to defamation causes are equitable in nature.  The cases turn upon the circumstances in which the defamatory statement is made and frequently involve a defamatory writing that has been kept in a place to which the plaintiff has no access or cause to seek access.  The plaintiff's inability to discover the libel when it first was "published" and placed in a confidential file would render unjust any holding that the cause of action accrued and the period of limitations commenced when the writing was placed in the file.

*Id.*, at 1248-1249, citations omitted.

In the instant action, Perfect 10 did not discover the defamation until CardService refused to provide processing last year.  (Complaint, Ex. "5" and ¶ 146.)  Further, the only persons alleged to have access to the Black List are "members [of defendants' associations] and third party processors."  (*Id.*, ¶ 12.)  Although Perfect 10 has not alleged expressly that defendants do not release the Black List to the public, the fact is that defendants treat the list as a state secret.  Indeed, Perfect 10 anticipates that defendants will attempt to prevent Perfect 10 from obtaining the list in discovery herein.  Therefore, Perfect 10 has alleged facts that show that the statute of limitations was tolled until at least May 2003 when Perfect 10 discovered the defamation.

**B.**  **The Complaint Alleges Facts to Establish that Placing Perfect 10 on the Black List Was a False Declaration that Perfect 10 Was Guilty of Fraud or Other Misconduct and Posed an Unreasonable Risk of Loss to Prospective Processors**

Defendants have the burden of pleading truth as a defense to defamation.  "Accordingly, 'a plaintiff need not allege the statements are false.'"  5 Witkin *California Procedure* (1997) Pleading, § 694, pp. 154-155.  In this instance, defendants have failed to meet that burden.

Defendants' argument, that the complaint on its face shows that their defamatory statements were true, rests on an incorrect and incomplete description of paragraph 28 of the complaint.  First, defendants wrongly state that "Perfect 10 concedes that at the time it was terminated it was in fact running excessive chargeback rates.  *See* Complaint, ¶ 28."  Second, defendants wrongly state that "Perfect 10 concedes that at the time *it was terminated it was in fact running excessive chargeback rates*.  *See* Complaint, ¶ 28."  (Motion, 27:18-20, emphasis in

1  original.)

2       Paragraph 28 of the complaint actually alleges as follows:

3            28.    Aiding and abetting the Stolen Content Websites'

4       unfair competition with plaintiff, in or about Spring 2001,

5       defendants arbitrarily terminated plaintiff's merchant account with

6       FDC, *allegedly* for high chargeback rates, after levying fines on

7       plaintiff of $100 per chargeback, and also kept plaintiff's money.

8       In fact, defendants knew that plaintiff had been a victim of hackers

9       who were subsequently investigated by the Secret Service.

10      Nevertheless, and *in spite of the fact that plaintiff subsequently ran a*

11      *chargeback ratio of about ½ of 1% from that point forward, well*

12      *within MasterCard and Visa limits*, defendants nevertheless

13      maintained plaintiff on the industry wide "black list."  Plaintiff has

14      not been able to process Visa cards directly as a result and has

15      incurred significantly higher costs by its inability to have its own

16      merchant account.  (Emphasis added.)

17      Paragraph 28 does not allege that defendants actually terminated Perfect 10 for high charge

18  backs.  Paragraph 28 does allege that defendants allegedly did so.  The word "alleged" is included

19  to signify that the high charge back accusation was a pretext.  Nor does Perfect 10 allege that it

20  had higher than allowed charge back rates when it was terminated.  When defendants terminated

21  Perfect 10, Perfect 10's chargeback ratio was well within defendants' limits.  Moreover, being

22  victimized by criminal activity does not constitute an admission of a high charge back ratio under

23  defendants' purported rules.

24      Defendants' reliance on the rules in Exhibit "2" to the complaint (a copy of which is

25  attached hereto for the Court's convenience) is also misplaced.  (*See* Motion 27:15-20.)  Those

26  rules show on their face that they apply only to certain particular classes of merchants, the

27  regulations for which apparently became effective on May 15, 2002 (Exhibit 2 page 1), after the

28  termination of Perfect 10's merchant account.  The High Risk Sponsored Merchant Program is an

1   arrangement that defendants have created to mask their involvement with illegal websites.  Under

2   the program, defendants service such "high risk" merchants—often the celebrity porn sites that

3   make up the vast bulk of the Stolen Content Websites—through third party "Internet Payment

4   Service Providers" ("IPSP").

5          Although the high risk sponsored merchant rules do not apply to Perfect 10, those rules do

6   support Perfect 10's allegation that placement on the Black List is a statement that a merchant is

7   engaged in fraudulent conduct.  Immediately before the language upon which defendants rely

8   about ensuring placement of terminated merchants on the Black List, defendants define good

9   cause for termination of a sponsored merchant.  That definition provides for termination "for

10  fraudulent activities … ."  (Complaint, Ex. 2, p. 5.)  In addition, the sponsored merchant rules

11  support Perfect 10's allegation that being Black Listed has prevented Perfect 10 from obtaining

12  charge card processing.  At page 6 of the rules, defendants decree that merchants on the Black List

13  are "disqualified from the Visa system and that Visa processing privileges must not be extended to

14  them."  (*Id.*, p. 6.)  Accordingly, defendants have failed to meet their burden of showing that their

15  defamatory statements were truthful.

16          **C.**     **Perfect 10 Has Alleged Facts that Show that Defendants Acted with Malice**

17          As defendants concede, their defamatory statements were not privileged if defendants

18  acted with malice.  However, defendants' assertion that malice has to be shown through ill will is

19  incomplete.  Malice also exists if defendant has knowledge of the falsity or acts in reckless

20  disregard for the truth.  *Vicar v. Package Machinery Company*, 841 F.Supp. 310, 314 (N.D. CA

21  2003); *Cabanas v. Gloodt Associates*, 942 F.Supp. 1295, 1301-1302 (E.D. Cal. 1996).

22          Defendants rely on *Pavolovsky v. The Board of Trade of San Francisco*, 171 Cal.App.2d

23  110 (1959).  (Motion, 28:20-29:5.)  In that case plaintiff alleged that defendant trade association's

24  statement, that plaintiff was insolvent, was defamatory.  Defendant demurred on the ground that

25  its statements were privileged.  The court sustained the demurrer with leave to amend because

26  plaintiff's complaint contained no allegations of malice.  (The case was dismissed because

27  plaintiff refused to amend.)  The court explained how plaintiff could have cured that deficiency, as

28  follows:

1

> The privilege here invoked is not absolute. It exists only in the
> absence of malice. When the privilege appears from the face of the
> complaint, the pleading must allege malice in fact in order to state a
> cause of action. … The complaint here lacks even the pleading of
> "malice" as a conclusion, and it contains no allegation of facts
> showing that defendant knew or should have known of the alleged
> falsity of the communication.

2

3

4

5

(*Id.*, at 114.)

6       In our case, Perfect 10 has pleaded the required facts. When defendants first put Perfect 10

7   on the Black List they knew that Perfect 10 was the victim of criminal activity, that Perfect 10 did

8   not have high charge backs, that Perfect 10 was not guilty of any operational failures, and that

9   Perfect 10 posed no risk of loss. (Complaint, ¶ 28, 9:2-7, ¶ 144, 36:13-19.) Therefore, defendants

10  knew that placing Perfect 10 on the Black List, and thereby stating that Perfect 10 was guilty of

11  fraud or other misconduct, was a false statement. Accordingly, Perfect 10 has alleged sufficient

12  facts to defeat any privilege that would have applied had defendants acted in good faith.

13       **D.      Perfect 10 Has Alleged Libel *Per Se* and Has Pleaded Special Damages**

14       Perfect 10 has alleged that inclusion on the Black List is defamatory on its face because it

15  is a false statement that Perfect 10 is guilty of wrongful conduct and imposes an unusually high

16  risk to any financial institution that provides processing services to it. (Complaint, ¶¶ 144, 36:8-

17  13.) *See* 5 Witkin *California Procedure* (1997) Pleading, § 483, pp. 567-568 (charge imputing

18  credit unworthiness, or that plaintiff is guilty of dishonesty or business misconduct is libel *per se*.)

19       Even if Perfect 10 had not alleged libel *per se*, which it has, Perfect 10 has alleged special

20  damages. In *MacLeod v. Tribune Publishing Co.,* 52 Cal.2d 536 (1959), defendant defamed

21  plaintiff dentist by publishing a newspaper article "charging that plaintiff was a communist

22  sympathizer or fellow traveler." (*Id.*, at 547.) The California Supreme Court held that plaintiff's

23  allegations of special damages were sufficient, as follows:

24

> Plaintiff alleged that as a result of the libel he "has suffered
> pecuniary loss in is profession as a dentist" in that an "unusually
> large percentage of old and established patients have been canceling
> appointments," and there "has been a sharp decline in the number of
> new patients normally to be expected. Plaintiff does not at this time
> know the exact extent of pecuniary loss resulting from the
> foregoing, but is informed and believes, and therefore alleges, that
> said loss is a continuing one, and that the amount of said loss will be
> in the sum of $5,000.00 or more; … These allegations are sufficient.

25

26

27

28

> The losses stated … are described with sufficient particularity to enable defendant to prepare its defense, and under the circumstances stated the extent of the loss may be alleged on information and belief.

(*Id.*, at 548.)

In the case at bar, Perfect 10 has met the California Supreme Court's standard in *MacLeod*. Perfect 10 has alleged that it "has not able to process Visa cards and has incurred significantly higher costs as a result of its inability to have its own merchant account." (Complaint, ¶ 28, 9:7-9.)  In addition, Perfect 10 has alleged lost customers and revenues.  (*Id.*, ¶ 147, 37:1.)  Those allegations are more than enough to enable defendants to prepare their defense.  Accordingly, this Court should deny the instant motion, in its entirety.

## X.   DEFENDANTS HAVE STATED A CLAIM FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

### A.   Perfect 10's Claim for Intentional Interference with Prospective Business Advantage Is Timely

Perfect 10's claim for intentional interference with prospective business advantage is timely for the same reasons that its libel claim is timely.  Perfect 10 did not sustain damage or discover the interference until after May 2003, less than one year before filing the instant action and well within the two year limitations period.

### B.   Perfect 10 Has Alleged a Probability of Future Economic Benefit Sufficient to State a Claim for Intentional Interference with Prospective Economic Advantage

Defendants' assertion that a "potential" economic relationship is insufficient to sustain a claim for intentional interference with prospective economic advantage, and that Perfect 10 has alleged only a "hypothetical" relationship, is incorrect.  Defendants have interfered with Perfect 10's prospective business relationships with Association members and ISOs, who will not do business with Perfect 10 because Perfect 10 is on the Black List.

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376 (1995), presented similar circumstances.  In that case, plaintiff was in the business of purchasing cars from defendant's dealerships, and exporting them for a profit.  Defendant circulated an "offenders list" of persons in plaintiff's business, including plaintiff, and prohibited dealers from selling cars to persons on the

1  list.  The California Supreme Court held that those facts were sufficient to affirm a judgment for

2  intentional interference with prospective business advantage.

3          Other cases have held that interference with business relationships with an existing or

4  potential customer base, such as Perfect 10 has alleged, is also sufficient to state a claim for

5  intentional interference with prospective business advantage.  For example, in *Uptown Enterprises*

6  *v. Strand*, 195 Cal.App.2d 45 (1961), defendant's interference with plaintiff's movie theater kept

7  patrons from coming to the theater.  The court held that defendant's interference with plaintiff's

8  customers was an interference with prospective business advantage.  (*Id.* at 51-52.)  In that case

9  the court held as follows:

10             Actionable interference of this kind is not limited to inducing breach
               of an existing contract or other wrongful conduct but comprises also
11             unjustifiably inducing a third person not to enter into or continue a
               business relation with another.
12
*Id.*, at 51, emphasis added.

13          Similarly, in *Willis v. Santa Ana Community Hospital Association* 58 Cal.2d 206 (1962)

14  (reversed on other grounds in *Cianci v. Supreme Court* , 40 Cal.3d 903 (1985), an osteopathic

15  physician alleged that defendants had prevented him from gaining membership on the staffs of

16  local hospitals.  Because he was unable to place patients in those hospitals for treatment, plaintiff

17  claimed that he had lost and would lose future patients.  The Court held that plaintiff had alleged

18  an injury sufficient to sustain his cause of action.  (*Id.*, at 810.)

19          In the case at bar, the "Black List" prevents Perfect 10 from doing business with

20  Association members and ISOs.  As a result, Perfect 10 cannot obtain direct charge card

21  transaction processing, has incurred significantly higher processing expenses.

22          **C.     Perfect 10 Has Alleged Independently Wrongful Acts**

23          As set forth above, Perfect 10 has alleged sufficient facts to show that defendants'

24  placement of Perfect 10 on the Black List constitutes libel, because defendants knew  it was a false

25  statement that Perfect 10 was guilty of fraud, dishonesty or other wrongful conduct.

26  **XI.    CONCLUSION**

27          For each of the foregoing reasons, Perfect 10 respectfully requests that this Court deny the

28

1   instant motion, in its entirety.[19]

2   DATED:      May 17, 2004          KING, HOLMES, PATERNO & BERLINER, LLP

3

4                                     By: _____
                                          HOWARD E. KING
5                                     Attorneys for Plaintiff PERFECT 10, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____
     [19] Perfect 10 believes that it has alleged sufficient facts to state each of the claims in the complaint.
27   However, in the event that the Court determines that any additional facts are necessary, Perfect 10
     respectfully requests leave to amend the complaint to state such facts.
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ..................................................... 1

    A.      Defendants' Relationship With The Stolen Content Websites ................................ 1

    B.      Perfect 10 Has Alleged Facts Sufficient to State Each of the Claims in the
        Complaint ................................................................................................................ 2

II.     STATEMENT OF FACTS ......................................................................................... 4

    A.      Perfect 10's Business ............................................................................................ 4

    B.      The Stolen Content Websites ................................................................................ 4

    C.      Defendants' Business ............................................................................................ 5

    D.      Defendants' Charge Card Transaction Processing for Stolen Content
        Websites and the Stolen Content Websites' Reliance on Defendants'
        Services ................................................................................................................... 5

    E.      Defendants' Control and Supervision of the Stolen Content Websites,
        Including Through Visa's High Risk Sponsored Merchant Program ...................... 6

    F.      Perfect 10's Actual, Written Notice to Defendants of the Illegal Activities
        of the Stolen Content Websites ............................................................................. 8

    G.      Defendants' Use of the Black List to Prevent Perfect 10 From Obtaining
        Charge Processing Services from Association Members and ISOs ....................... 9

        1.      Defendants' Arbitrary Termination of Perfect 10s' Merchant
            Account ..................................................................................................... 9

        2.      Defendants' Placement of Perfect 10 on The Black List and the
            Adverse Consequences of that Listing ..................................................... 9

    H.      Perfect 10's Damages ......................................................................................... 10

III.    STANDARDS APPLICABLE TO THE INSTANT MOTION ........................................... 10

IV.     ALTHOUGH DUTY IS NOT AN ELEMENT OF ANY OF PERFECT 10'S
    CAUSES OF ACTION, DEFENDANTS HAVE A DUTY TO POLICE STOLEN
    CONTENT WEBSITES ........................................................................................... 11

V.      PERFECT 10 HAS PROPERLY STATED CLAIMS FOR DEFENDANTS'
    SECONDARY LIABILITY FOR COPYRIGHT INFRINGEMENT ..................................... 18

    A.      Contributory Infringement .................................................................................. 18

    B.      Vicarious Infringement ....................................................................................... 22

        1.      Right and Ability to Control ..................................................................... 22

2.  Direct Financial Benefit ........................................................................ 24

VI.  PERFECT 10 HAS ALLEGED FACTS SUFFICIENT TO STATE A CLAIM FOR DEFENDANTS' LANHAM ACT VIOLATION .................................................. 26

VII.  PERFECT 10 HAS ALLEGED FACTS SUFFICIENT TO STATE A CLAIM FOR DEFENDANTS' VICARIOUS LIABILITY FOR VIOLATION OF PUBLICITY RIGHTS ....................................................................................................... 28

VIII.  DEFENDANTS ARE LIABLE FOR VIOLATION OF SECTIONS 17200 AND 17500 OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE .................. 30

A.  *Emery* Does Not Preclude Secondary Liability for Violations of Cal. Bus. & Prof. Code Section 17200, et. seq. .............................................. 30

B.  Perfect 10 Has Properly Alleged Defendants Aided and Abetted the Unlawful Acts of the Stolen Content Website Merchants ......................... 31

C.  Perfect 10's State Law Claims Are Not Preempted By The Copyright Act .......... 32

D.  Perfect 10's State Law Unfair Competition Claims Are Not Congruent With Its Lanham Act Claims ................................................................... 35

E.  Defendants Have Direct Involvement In Unfair Competition Not Based Upon Aiding And Abetting ..................................................................... 35

IX.  PERFECT 10 HAS STATED A CLAIM FOR RELIEF FOR LIBEL ................... 35

A.  The Libel Claim Is Timely ..................................................................... 35

1.  A New Limitations Period Began to Run When Defendants Republished the Black List During the Year Before Perfect 10 Filed the Complaint ........................................................................ 36

2.  Perfect 10's Discovery that Defendants Defamed It Was Less than One Year Before Perfect 10 Filed this Case ................................. 37

B.  The Complaint Alleges Facts to Establish that Placing Perfect 10 on the Black List Was a False Declaration that Perfect 10 Was Guilty of Fraud or Other Misconduct and Posed an Unreasonable Risk of Loss to Prospective Processors ............................................................................................. 38

C.  Perfect 10 Has Alleged Facts that Show that Defendants Acted with Malice ........ 40

D.  Perfect 10 Has Alleged Libel *Per Se* and Has Pleaded Special Damages ............. 41

X.  DEFENDANTS HAVE STATED A CLAIM FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE ....................... 42

A.  Perfect 10's Claim for Intentional Interference with Prospective Business Advantage Is Timely ............................................................................ 42

B.  Perfect 10 Has Alleged a Probability of Future Economic Benefit Sufficient to State a Claim for Intentional Interference with Prospective Economic Advantage ........................................................................................... 42

        C.      Perfect 10 Has Alleged Independently Wrongful Acts ........................................... 43

XI.    CONCLUSION ......................................................................................................... 44

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

4  <u>CASES</u>

5  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ........................................ 19-22

6  *Adobe Systems, Inc. v. Canus Productions, Inc.*, 173  F.Supp. 2d 1044 (C.D. Cal. 2003) ........ 24-26

7  *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1529 (9th Cir. 1995)........................................................ 10

8  *Cabanas v. Gloodt Associates*, 942 F.Supp. 1295 (E.D. Cal. 1996)  ........................................ 41

9  *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532 (1998) ........................................................ 16-17

10  *Cianci v. Supreme Court* , 40 Cal.3d 903 (1985)  ...................................................................... 43

11  *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376 (1995)................................ 42-43

12  *Denbicare U.S.A., Inc. v. Toys "R" Us, Inc.*, 84 F.3d 1143 (9th Cir. 1996)............................... 35

13  *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) ............................................................ 18, 27

14  *Emery v. Visa International Service Association,*
        95 Cal.App. 4th 952 (2002)…………………………………………… 14, 15, 16, 17, 18, 30, 31

15  *Entous v. Viacom Intern'l, Inc.*, 58 U.S.P.Q.2d 1628 (C.D. Cal., 2001) ................................... 32

16  *Firoozye v. Earthlink Network*, 153 F.Supp.2d 1115 (N.D. CA 2001)...................................... 10

17  *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) ...............................19-22, 27-28

18  *Hearn v. R.J. Reynolds Tobacco Co.*, 279 F.Supp.2d 1096 (D. AZ 2003) ................................. 10

19  *Horton v. Marovich*, 925 F.Supp. 532 (N.D. Ill. 1996) .......................................................... 10-11

20  *Howard v. Superior Court*, 2 Cal. App. 4th 745 (1992) ............................................................ 31

21  *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844 (1982) ..................................................... 26-27

22  *Kanarek v. Buglioi,* 108 Cal.App.3d 327 (1980) ....................................................................... 37

23  *KNB Enterprises v. Matthews*, 78 Cal.App. 4th 362 (2000) ..................................................... 34

24  *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619 (6th Cir. 2000)......................................... 34

25  *Lattie v. Murdach*, 1997 WL 33803 at *4 (N.D. Cal. 1997) ...................................................... 32

26  *Livnat v. Lavi*, 46 U.S.P.Q. 2d (BNA) 1300 (S.D.N.Y. 1998) .................................................. 21

27  *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980 (9th Cir. 1999).............. 15, 27-28

28

KING, HOLMES,
PATERNO
& BERLINER LLP

PLAINTIFF'S OPPOSITION TO CONSOLIDATED MOTION TO DISMISS; MEMO OF Ps and As

*MacLeod v. Tribune Publishing Co.*, 52 Cal.2d 536 (1959) ..................................................... 41-42

*McGuigan v. Southern Pacific Company*, 112 Cal.App.2d 704 (1952) .................................. 11-12

*Mid-Cal National Bank v. Federal Reserve Bank of San Francisco*,
590 F.2d 761 (9th Cir. 1979) ………………………………………………… 12, 16-17

*Neilson v. Union Bank of California*, 290 F.Supp.2d 1101 (C.D. Cal. 2003).......................... 11, 17

*Parks School of Business, Inc. v. Symington*, 51 F.3d 1480 (9th Cir. 1995)................................. 10

*Pavolovsky v. The Board of Trade of San Francisco*, 171 Cal.App.2d 110 (1959).................. 41-42

*People vs. Toomey*, 157 Cal. App. 3d 1 (1984).......................................................................30-31

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
213 F.Supp.2d 1146 (C.D. Cal. 2002)………………………………………… 22-27

*Religious Technology Center v. Netcom*, 907 F.Supp. at 1361 (N.D. Cal. 1995).....................22-23

*Samara Brothers, Inc. v. Wal-Mart Stores, Inc.*, 165 F.3d 120 (2d Cir. 1998)............................. 33

*Samara Brothers, Inc. v. Wal-Mart Stores, Inc.*, 529 U.S. 205 (2000) ........................................ 33

*Schneider v. United Airlines, Inc.*, 208 Cal.App.3d 71 (1989) ..................................................... 36

*Shively v. Bozanich,* 31 Cal.4th 1230 (2003) ..........................................................................35-38

*Sony Corp. v. Universal Studios, Inc.*, 464 U.S. 417 (1984) ........................................................ 15

*Titan Sports v. Turner Broadcasting Systems*, 981 F.Supp. 65 (D.Conn. 1997) .......................... 33

*Uptown Enterprises v. Strand*, 195 Cal.App.2d 45 (1961) .......................................................... 43

*Vicar v. Package Machinery Company*, 841 F.Supp. 310 (N.D. CA 2003) .................................. 40

*Warner Bros., Inc. v. American Broadcasting Companies, Inc.*, 720 F.2d 231 (2d. Cir.
1983)................................................................................................................................ 33

*Willis v. Santa Ana Community Hospital Association* 58 Cal.2d 206 (1962) ............................... 43


STATUTES

17 U.S.C. § 106(3) ....................................................................................................................... 21

Bus. & Prof. Code § 17200, et. seq. ................................................................................ 17, 30, 31

Cal. Financial Code §§ 952-53 ...................................................................................................... 17

Cal.Civ.Code § 1714 .................................................................................................................... 12

OTHER AUTHORITIES

2 Dobbs, *The Law of Torts*, § 314, at 853 (2001) ..................................................................... 11-12

5 Witkin *California Procedure* (1997) Pleading, § 483, pp. 567-568 ........................................... 41

5 Witkin *California Procedure* (1997) Pleading, § 694, pp. 154-155 ........................................... 38

*Nimmer on Copyright*, § 1.10[B] at 1-12 to 1-13 (1989) ....................................................... 32-33

*Restatement (Second) of Torts* § 876 (1979) .................................................................................. 29

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KING, HOLMES,
PATERNO
& BERLINER LLP

vii

PLAINTIFF'S OPPOSITION TO CONSOLIDATED MOTION TO DISMISS; MEMO OF Ps and As